#24665-a-JKM

**2008 SD 114**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                                    Plaintiff and Appellee,

   v.

AARON NOTEBOOM,                                    Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
DOUGLAS COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE BRUCE V. ANDERSON
Judge

\* \* \* \*

LAWRENCE E. LONG
Attorney General

GARY CAMPBELL
Assistant Attorney General                          Attorneys for plaintiff
Pierre, South Dakota                                and appellee.

TIMOTHY R. WHALEN                                   Attorney for defendant
Lake Andes, South Dakota                            and appellant.

\* \* \* \*

ARGUED ON SEPTEMBER 30, 2008

OPINION FILED **11/25/08**

MEIERHENRY, Justice

[¶1.]        Aaron Noteboom appeals his conviction for Driving under the Influence of Alcohol.  Noteboom claims that the stop of his vehicle violated his right against unreasonable search and seizure.  We affirm.

**FACTS**

[¶2.]        On September 24, 2006, at approximately 2:00 a.m., Deputy Sheriff Troy Strid and Corsica Chief of Police Marty Banghart were both patrolling at separate locations on Highway 281 in Corsica, South Dakota.  Both police officers saw automobile headlights appear and then disappear in the distance near 274th Street on the edge of Corsica.  The headlights seemed to disappear near a storage area located on private property.  Without communicating to each other, both officers drove to the area to investigate.

[¶3.]        Arriving first, Deputy Strid saw tire tracks going into the private property from one of its two driveways.  Because of recent rain, Deputy Strid noticed that the tracks were fresh.  Deputy Strid followed the tracks onto the property.  As he turned a corner, he noticed a vehicle parked behind one of the buildings with its headlights off.  Immediately, the headlights came on, and the vehicle headed to the second driveway to return to 274th Street.  The vehicle, driven by Noteboom, turned onto the street in front of Chief Banghart, who was driving on 274th Street toward the second driveway.  When Noteboom pulled onto the street, Chief Banghart approached Noteboom's vehicle from behind and initiated the stop.  Both officers testified that Noteboom did not violate any traffic laws or have any vehicle violations.  Deputy Strid testified he "was going to initiate a traffic stop on

[the vehicle], to see what was going on." Chief Banghart testified that he made the stop because "if the vehicle was there for, for a good reason, they would still be in there doing whatever they were doing."

[¶4.] After making the stop, Chief Banghart observed that the driver of the vehicle, Noteboom, was intoxicated. Chief Banghart subsequently arrested Noteboom for Driving under the Influence of Alcohol. Noteboom moved to suppress the evidence because the officers did not have reasonable suspicion to stop him. The circuit court denied Noteboom's motion and found Noteboom guilty of Driving under the Influence of Alcohol. Noteboom appeals, raising one issue.

## ISSUE

**Whether the stop, detention, and subsequent search of Noteboom and his property violated Noteboom's constitutional rights.**

## ANALYSIS

[¶5.] Noteboom contends that the officers did not have reasonable suspicion to stop and search his vehicle, and therefore, the stop violated his constitutional rights. "'Our review of a motion to suppress based on an alleged violation of a constitutionally protected right is a question of law examined de novo.'" State v. Hayen, 2008 SD 41, ¶5, 751 NW2d 306, 308 (quoting State v. Muller, 2005 SD 66, ¶12, 698 NW2d 285, 288). The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. US Const amend IV; US Const amend XIV; *see also* SD Const art VI § XI. The right to be free from "unreasonable searches and seizures applies when a vehicle is stopped by law enforcement." *Muller,* 2005 SD 66, ¶14, 698 NW2d at 288 (citations omitted). A

stop will, however, be permitted if the officer has "'reasonable suspicion to believe that criminal activity 'may be afoot.'" *Hayen*, 2008 SD 41, ¶5, 751 NW2d at 308 (quoting State v. Kenyon*, 2002 SD 111, ¶14, 651 NW2d 269, 273 (citations omitted)). To justify an automobile stop, the officer must have a "'specific and articulable suspicion of a violation[.]'" State v. Vento, 1999 SD 158, ¶8, 604 NW2d 468, 470 (quoting State v. Cuny*, 534 NW2d 52, 53 (SD 1995)).

[¶6.]      Beginning with *Terry v. Ohio*, the United States Supreme Court has directed that reviewing courts should consider the "reasonableness of a particular search or seizure in light of the particular circumstances." 392 US 1, 21, 88 SCt 1868, 1880, 20 LEd2d 889 (1968); *see* United States v. Cortez, 449 US 411, 417, 101 SCt 690, 695, 66 LEd2d 621 (1981) (holding that courts must look to the "totality of the circumstances" to determine if a stop is justified). In *U.S. v. Arvizu*, the Court reiterated the totality of the circumstances analysis as follows:

> The Fourth Amendment prohibits "unreasonable searches and seizures" by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest. *Terry*, 392 US at 9, 88 SCt at 1873; *Cortez*, 449 US at 417, 101 SCt at 694-95, 66 LEd2d 621 (1981). Because the "balance between the public interest and the individual's right to personal security," United States v. Brignoni-Ponce, 422 US 873, 878, 95 SCt 2574, 2578-79, 45 LEd2d 607 (1975), tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity "'may be afoot,'" United States v. Sokolow, 490 US 1, 7, 109 SCt 1581, 1585, 104 LEd2d 1 (1989) (quoting *Terry*, 392 US at 30, 88 SCt at 1884-85). *See also Cortez*, 449 US at 417, 101 SCt at 694-95 ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity").
>
> When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for

suspecting legal wrongdoing. *See, e.g., id.,* at 417-18, 101 SCt at 694-95. This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person." *Id.* at 418, 101 SCt at 695. *See also* Ornelas v. United States, 517 US 690, 699, 116 SCt 1657, 1663, 134 LEd2d 911 (1996) (reviewing court must give "due weight" to factual inferences drawn by resident judges and local law enforcement officers). Although an officer's reliance on a mere "'hunch'" is insufficient to justify a stop, *Terry,* 392 US at 27, 88 SCt at 1883, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard, *Sokolow,* 490 US at 7, 109 SCt at 1585.

*Arvizu*, 534 US 266, 273-74, 122 SCt 744, 750-51, 151 LEd2d 740 (2002).

Nevertheless, "[t]he officer, of course, must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.'"" *Sokolow*, 490 US at 7, 109 SCt at 1585 (citation omitted). "The Fourth Amendment requires 'some minimal level of objective justification' for making the stop." *Id.* (quoting INS v. Delgado, 466 US 210, 217, 104 SCt 1758, 1763, 80 LEd2d 247 (1984)). "'[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the *least intrusive means* reasonably available to *verify or dispel* the officer's suspicion in a short period of time.'" *Hayen,* 2008 SD 41, ¶7, 751 NW2d at 308-09 (quoting State v. Ballard, 2000 SD 134, ¶11, 617 NW2d 837, 841 (emphasis added)) (quoting Florida v. Royer, 460 US 491, 500, 103 SCt 1319, 1325-26, 75 LEd2d 229 (1983) (citations omitted)).

[¶7.] We recently upheld a vehicle stop in *State v. Bergee* under somewhat similar circumstances. 2008 SD 67, 753 NW2d 911. In *Bergee*, the police were on a late-night stakeout watching the area where eight businesses had been burglarized

in the prior two weeks. *Id.* ¶¶2-3. The break-ins for six of the burglaries occurred on the back or side of the buildings. *Id.* ¶2. As the police watched the area, they spotted the defendant's vehicle emerge from behind one of the businesses under surveillance. *Id.* ¶4. One of the officers stopped the defendant to determine what he was doing behind the closed business at that time of night. *Id.* ¶5. We held in *Bergee* that the string of burglaries coupled with the location of the defendant's vehicle and the time of night provided reasonable suspicion to make an investigatory stop. *Id.* ¶11.

[¶8.]		In *Bergee*, the prior thefts and burglaries entered into the totality of the circumstances analysis justifying the stop. In the present case, prior thefts were not a factor even though Chief Banghart claimed he was "keep[ing] an eye on stuff out there." Chief Banghart testified that one of the property owners had commented to him within the last month or two "that pieces were missing off of vehicles they have out there." The circuit court discounted Chief Banghart's testimony and found that "the officers' testimony that theft and vandalism had been reported by the owners of the storage area [was] not supported by the evidence." We defer to the circuit court's credibility determination. Consequently, we look at the remaining circumstances to determine if the circumstances supported reasonable suspicion to justify the investigatory stop.

[¶9.]		Noteboom argues that the officers admitted that the stop was based on curiosity, whim or caprice. *See* State v. Quartier, 2008 SD 62, ¶10, 753 NW2d 885, 888 (citations omitted). Both officers admitted on cross-examination that curiosity originally led them to investigate what had happened to the distant disappearing

lights. Their curiosity, however, grew into suspicion when they arrived at the location. Deputy Strid saw the fresh tracks leading into the private storage area. He then "saw a white vehicle with no . . . lights on. And as [the vehicle] came around the corner, the lights came on and the vehicle proceeded to leave." Deputy Strid then followed the vehicle as it headed back to 274th Street. He said he was "going to initiate a traffic stop on it, to see what was going on." Chief Banghart saw this unfold and stopped Noteboom for the following reason: "[A]t that point because [Deputy Strid] was still behind him, still moving, I did make the stop because you know if, if the vehicle was there for, for a good reason, they would still be in there doing whatever they were doing."

[¶10.] Both officers were concerned because the vehicle had entered private property at 2:00 a.m. for no obvious reason since the buildings on the property were vacant and only used to restore antique tractors. The officers' suspicions were additionally piqued by the subsequent actions of the driver. When they first saw the vehicle, it was parked by the storage building with its lights off. Then, the driver suddenly turned on the lights and quickly drove off the property as Deputy Strid's patrol car came around the building. Such late night activity was unusual in the small rural community of Corsica.

[¶11.] In *Illinois v. Wardlow*, the United States Supreme Court recognized that flight may be one of the factors leading law enforcement to suspect criminal activity is afoot. 528 US 119, 124, 120 SCt 673, 676, 145 LEd2d 570 (2000). In *Wardlow,* the defendant fled when he saw "police officers patrolling an area known for heavy narcotics trafficking." *Id.* at 121, 120 SCt at 674. The officers ran after

him, stopped him, and did a protective patdown search.  The Court determined that, in addition to the defendant's presence in the high-crime area, his "unprovoked flight upon noticing the police" raised the officers' suspicions.  *Id.* at 124, 120 SCt at 676.  The Court analyzed it as follows:

> Headlong flight – wherever it occurs – is the consummate act of evasion:  It is not necessarily indicative of wrongdoing but it is certainly suggestive of such.  In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behaviors, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists.  Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.

*Id.* at 124-25, 120 SCt at 676.  Even though an individual has "a right to ignore the police and go about his business," the Court determined that "unprovoked flight" was not "going about one's business."  *Id.* at 125, 120 SCt at 676 (citations omitted).  The Court explained that officers can detain "individuals to resolve ambiguity."  *Id.* at 125, 120 SCt at 677 (citations omitted).

> In allowing such detentions, *Terry* accepts the risk that officers may stop innocent people.  Indeed, the Fourth Amendment accepts that risk in connection with more drastic police action; persons arrested and detained on probable cause to believe they have committed a crime may turn out to be innocent.  The *Terry* stop is a far more minimal intrusion, simply allowing the officer to briefly investigate further.  If the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way.

*Id.* at 126, 120 SCt at 677.

[¶12.]          In Noteboom's case, the circuit court determined that "in a small rural community where the officers are charged with the duty to protect people's property from theft and vandalism, such activity would require the officer to make further

inquiry." This was not a high crime area but, as the circuit court noted, an area with "little crime and sparse traffic." This contrasts with courts that have considered a high crime area as an articulable factor in the totality of the circumstances analysis. *See* United States v. Magda, 547 F2d 756 (2dCir 1976); United States v. Garr, 461 F2d 487 (5thCir 1972); Harris v. United States, 382 A2d 1016 (DC 1978); Com. v. Almeida, 373 Mass 266, 366 NE2d 756 (1977). Although the circuit court's inference seems counterintuitive compared with those cases that recognize a high crime area as a factor, we are compelled to give "due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas*, 517 US at 699, 116 SCt at 1663.

[¶13.] The Fourth Amendment protects against unreasonable search and seizure and requires objective reasonable suspicion to make an investigatory stop. The circuit court determined that based on the totality of the circumstances, the officers could "reasonably believe that criminal activity was afoot." The circuit court specifically relied on the following circumstances to justify the stop: 1) that Corsica was "a small rural town with little criminal activity and sparse traffic in the early morning hours;" 2) that 2:00 AM traffic seen in the distance would normally have pulled out onto Highway 281, rather than disappear near a known storage area; 3) that "in a small rural community where the officers are charged with the duty to protect people's property from theft and vandalism, such activity would require the officer to make further inquiry;" and 4) that when the officers approached the storage area, the defendant abruptly drove away. Although these circumstances

constitute a minimal objective justification for an investigatory stop, we determine they are reasonable under the totality of the circumstances.

[¶14.]     We affirm.

[¶15.]     GILBERTSON, Chief Justice, and SABERS, KONENKAMP, and ZINTER, Justices, concur.