#24960-a-PER CURIAM

**2009 SD 48**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE  OF SOUTH DAKOTA,          Plaintiff and Appellee,

    v.

JAMES MICHAEL IVERSEN,         Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT
OF THE THIRD JUDICIAL CIRCUIT
LAKE COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE TIM D. TUCKER
Judge

\* \* \* \*

LAWRENCE E. LONG
Attorney General

SHERRI SUNDEM WALD
Deputy Attorney General        Attorneys for plaintiff
Pierre, South Dakota        and appellee.

MANUEL J. de CASTRO, JR.      Attorney for defendant
Madison, South Dakota        and appellant.

\* \* \* \*

CONSIDERED ON BRIEFS
ON MARCH 23, 2009

OPINION FILED **06/24/09**

#24960

PER CURIAM

[¶1.]        James Iversen appeals his conviction for driving or control of a vehicle with a prohibited blood alcohol level.  We affirm.

FACTS

[¶2.]        At approximately 1:30 on the morning of January 5, 2008, a police officer patrolling in the City of Madison passed by the parking lot of an agricultural supply store.  Behind an old gas station in the parking lot, the officer observed a Ford pickup parked beside a semi trailer.  The lights of the pickup were off and the engine was running.  Because of the early-morning hour and a history of battery thefts in the area, the officer became concerned and pulled into the parking lot.  The officer then focused his patrol car's spotlight on the pickup and exited his vehicle to make contact with the pickup's driver and passenger.

[¶3.]        As the officer approached the pickup, the driver rolled his window down.  The officer immediately smelled the odor of an alcoholic beverage coming from the pickup and observed that the driver had bloodshot, glassy eyes and that his face was flushed.  When the officer asked the driver what he and his passenger were doing the driver replied that they were just talking.  After some other small talk, the officer asked the driver for his driver's license which the driver gave to the officer.  The officer identified the driver as Iversen and, because of the odor of alcoholic beverages and other indications of consumption, asked Iversen to come back to his patrol car.  The officer eventually had Iversen perform a series of field sobriety tests and, based upon the results and his earlier observations, placed Iversen under arrest for driving under the influence of alcohol.

[¶4.]		After the arrest, the officer read Iversen the *Miranda* warnings and Iversen agreed to answer questions. Iversen admitted to consuming a number of beers at a local bar and that after leaving that establishment he and his companion had driven to the parking lot where the officer found them conversing. After these admissions, the officer transported Iversen to a local hospital for a blood draw. Testing later established Iversen's blood alcohol level was .153% by weight of alcohol in the blood.

[¶5.]		The State charged Iversen with alternative counts of driving or control of a vehicle with a prohibited blood alcohol level and driving or control of a vehicle while under the influence of an alcoholic beverage. Before trial, Iversen moved to suppress the evidence obtained during his encounter with the police officer arguing it was the product of an unconstitutional stop, seizure and arrest. After an evidentiary hearing, the trial court entered findings of fact, conclusions of law and an order denying the motion to suppress. Iversen petitioned for an intermediate appeal of the order, which this Court denied.

[¶6.]		Iversen waived a jury trial and his case was tried to the court on July 3, 2008. During trial, Iversen renewed his evidentiary objections, which were again overruled. At the close of trial, the court found Iversen guilty of driving or control of a vehicle with a prohibited blood alcohol level. Iversen was sentenced on July 21, 2008, to thirty days in jail plus fines and costs totaling $500. The jail time was suspended on various terms and conditions and was stayed for purposes of appeal. Iversen now appeals to this Court.

ISSUE

[¶7.]        **Whether the trial court erred in denying Iversen's motion to suppress.**

> Our review of a motion to suppress based on an alleged violation of a constitutionally protected right is a question of law examined de novo.  *See* State v. Hirning, 1999 SD 53, ¶ 9, 592 NW2d 600, 603; Ornelas v. United States, 517 US 690, 699, 116 SCt 1657, 1663, 134 LEd2d 911 (1996) (standard of review for questions under the Fourth Amendment); United States v. Khan, 993 F2d 1368, 1375 (9thCir 1993).  We review findings of fact under the clearly erroneous standard.  *See* State v. Almond, 511 NW2d 572, 573-74 (SD 1994).  Once the facts have been determined, however, the application of a legal standard to those facts is a question of law reviewed de novo.  Spenner v. City of Sioux Falls, 1998 SD 56, ¶ 13, 580 NW2d 606, 610.

State v. Sheehy, 2001 SD 130, ¶ 6, 636 NW2d 451, 452.

[¶8.]        Iversen argues that the trial court erred in denying his motion to suppress because the evidence against him was obtained as a result of an unconstitutional vehicle stop.  In support of his argument, Iversen relies on a line of cases addressing the legality of vehicle stops.  *See, e.g.,* State v. Noteboom, 2008 SD 114, ¶ 3, 758 NW2d 457, 458 (police chief approached defendant's vehicle from behind and initiated a traffic stop); State v. Bergee, 2008 SD 67, ¶ 5, 753 NW2d 911, 912 (police officer stopped defendant's vehicle before it could leave a parking lot).  However, as pointed out by the trial court in its analysis of this case, "the significant issue [here] is that there was no stop, the vehicle was already stopped."

[¶9.]        The trial court's analysis correctly recognized that not every encounter between a citizen and the police constitutes a Fourth Amendment seizure.  *See* Terry v. Ohio, 392 US 1, 19 n16, 88 SCt 1868, 1879, 20 LEd2d 889 (1968)

-3-

(stating that "not all personal intercourse between policemen and citizens involves 'seizures' of persons"); United States v. Mendenhall, 446 US 544, 554, 100 SCt 1870, 1877, 64 LEd2d 497 (1980) (plurality) (Stewart, J.)) (stating that "characterizing every street encounter between a citizen and the police as a 'seizure' [would not enhance] any interest secured by the Fourth Amendment").

[¶10.] "Only when [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may [a court conclude] that a 'seizure' has occurred." *See Terry*, 392 US at 19 n16, 88 SCt at 1879, 20 LEd2d 889. This standard is met when law enforcement stops a vehicle, necessitating a reasonable suspicion of criminal activity to support the stop. *See Noteboom*, 2008 SD 114, ¶ 6, 758 NW2d at 459 (quoting United States v. Arvizu, 534 US 266, 273-74, 122 SCt 744, 750-51, 151 LEd2d 740 (2002)) (stating that Fourth Amendment protections extend to brief investigatory stops of vehicles and that the amendment is satisfied if the officer's action is supported by a reasonable suspicion to believe criminal activity is afoot); *Bergee*, 2008 SD 67, ¶ 10, 753 NW2d at 914 (stating that brief investigatory traffic stops are permitted when based on an objectively reasonable and articulable suspicion that criminal activity is occurring). Here, however, as recognized by the trial court, there was no vehicle stop; the vehicle was already stopped. The only prior South Dakota case cited by the parties that addresses the legality of a law enforcement encounter with the driver of a vehicle already stopped is *State v. Sheehy,* 2001 SD 130, 636 NW2d 451.

[¶11.] In *Sheehy*, a conservation officer received an anonymous tip about a game violation. The tipster provided Sheehy's location and the license number of

#24960

his vehicle. The officer drove to the location given and found a vehicle registered to Sheehy parked in a parking lot. Soon, the officer observed a man place some items into the vehicle. The officer approached the man and learned that he was, in fact, Sheehy. The officer asked to see Sheehy's game and Sheehy led the officer into a nearby restaurant where the game was being kept in some coolers. The ensuing investigation led to Sheehy's conviction for a game violation.

[¶12.] On appeal, Sheehy argued that the questioning by the officer in the parking lot was an impermissible stop because the anonymous tip was not reliable. This Court held that the initial questioning of Sheehy by the officer was not a seizure under the Fourth Amendment because Sheehy was never told that he was not free to leave nor did the officer frisk or "pat-down" Sheehy at any time prior to arrest. *Sheehy*, 2001 SD 130, ¶ 8, 636 NW2d at 453. The Court went on to observe that it is "imperative" for police to conduct routine investigations and question people in public areas and that investigative questions do not translate into a constitutional infringement without a threat of police detention. *Id.* ¶ 9. In support of its observations, the Court quoted the following analysis from *Florida v. Bostick*, 501 US 429, 433, 111 SCt 2382, 2385, 115 LEd2d 389, 398 (1991):

> Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free "to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required." The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature. The Court made precisely this point in Terry v. Ohio, 392 US 1, 19, n16, 88 SCt 1868, 1879, 20 LEd2d 889, n16 (1968): "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force

-5-

or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."

[¶13.] Reasoning similar to that employed in *Sheehy* has been applied in cases even more analogous to Iversen's. In *United States v. Barry*, 394 F3d 1070 (8thCir 2005), a police officer on patrol at approximately 11:00 p.m. noticed a parked vehicle's headlights in an alley behind a shopping mall. Because of the late hour and a history of crime in the area, the officer drove into the mall's parking lot and the parked vehicle's headlights went out. The officer proceeded into the alley and parked his marked cruiser fifteen feet to fifteen yards in front of the parked car. The officer did not activate his emergency lights, but kept his cruiser's headlights on. The officer later explained that he took these actions "'to find out what was going on' based on his 'fear of . . . criminal activity[.]'" *Id.* at 1072.

[¶14.] When the police officer exited his cruiser, he noticed two individuals who had been standing outside the parked vehicle get into the vehicle and also saw its headlights come back on. As the officer approached the vehicle, he shined his flashlight on his uniform and kept his hand on his holstered gun. The officer twice knocked on the passenger's window without receiving a response. At some point the officer noticed a mist inside the vehicle and, when he knocked on the window for a third time, the passenger rolled it down. At that time, the officer smelled marijuana and air freshener. The officer then determined that he had grounds to detain the occupants, called for backup and asked the occupants to exit their vehicle. A subsequent investigation and search of the vehicle led to federal charges against the defendant as a felon in possession of a firearm.

[¶15.] The district court in *Barry* suppressed evidence seized from the vehicle on the basis that the police officer lacked reasonable suspicion for the stop and because the stop was invalid from its inception. The Eighth Circuit reversed holding that the initial encounter between the officer and the defendant and his companion did not constitute a detention implicating the Fourth Amendment. In its reasoning, the court identified the test for determining when an encounter between a police officer and a citizen constitutes a Fourth Amendment detention or seizure as, "'whether, taking into account all of the circumstances surrounding the encounter, the police conduct would "have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business."'" *Barry*, 394 F3d at 1074-75 (quoting *Bostick*, 501 US at 437, 111 SCt at 2387).

[¶16.] Applying *Bostick* to the facts in *Barry*, the court concluded that the defendant was not seized until the officer asked him to exit the vehicle and that, by that time, the officer had a reasonable suspicion to detain the defendant to investigate possible wrongdoing. In reaching its conclusion, the court held that the officer's conduct in approaching the defendant's parked vehicle and knocking on the window was not sufficient to warrant a reasonable belief by the defendant that he was not at liberty to ignore the officer's presence and go about his business. The court further reasoned that, up to the point where the passenger rolled down his window, all that had occurred was that the officer had driven his marked cruiser into the alley to see why a vehicle with its headlights on was parked in the alley at 11:18 p.m. when all of the nearby stores were closed. Finally, the court observed:

> Up to the point when [the officer] saw a mist inside the
> vehicle and smelled marijuana and air freshener, [the

> officer] exhibited no show of authority, that is, he never raised his voice, he never drew his holstered weapon, he never activated his emergency lights, and he never ordered [the defendant] to exit his vehicle. [The officer] had merely approached a parked vehicle, which the Fourth Amendment permits. [The defendant] had simply encountered a police officer in a public place. No reasonable person would have believed he was seized at that point.

*Barry*, 394 F3d at 1075.

[¶17.]    There is no factor of significance to distinguish this case from *Barry*. As in *Barry*, at a late-night hour the officer here observed a motor vehicle parked in the parking lot of a retail store with its engine running. The vehicle was not parked in a place where the officer would normally expect to see a vehicle parked at that hour. There was also a history of criminal activity in the area.*  Because of the late hour and concerns over possible criminal activity, the officer pulled into the parking lot to see who the occupants of the vehicle were and what they were doing. The officer pulled in close behind the vehicle, within half a car length or so, and illuminated it with the headlights and spotlight of his patrol car. However, no other lights, including emergency lights, were activated by the officer. Moreover, despite the closeness of the patrol car to the other vehicle, there is nothing in the record showing the patrol car interfered with the other vehicle's egress so that it could not be driven away if the driver so desired.

---

\*    Iversen makes much of the fact that it had been at least a year since prior criminal activity in or near the parking lot. In this vein, it is notable that *Barry* makes no reference to the time of the prior criminal activity, only that it had occurred. *See Barry*, 394 F3d at 1072 (stating, "This general area had experienced some crime in the past, and several retail stores were burglarized at night.").

[¶18.] The officer exited his patrol car and approached the other vehicle in uniform. The officer exhibited no other show of authority. There is no evidence that he raised his voice or drew or even touched his weapon. There is no evidence that he pointed at his badge. There is no evidence that he informed the occupants of the other vehicle that they were not free to leave. There is no evidence that he instructed the occupants to get out of their car. On arriving at the driver's door of the other vehicle, the driver quickly rolled his window down without any instruction from, or repeated knocking by, the officer. When the window was open, the officer immediately smelled the odor of an alcoholic beverage and made additional observations of the driver suggesting that he may have been consuming alcoholic beverages. From that point forward, just as with the odor of marijuana in *Barry*, there was a reasonable suspicion for the officer to detain Iversen to investigate possible wrongdoing.

[¶19.] Based upon the foregoing, the officer's conduct in approaching Iversen's parked vehicle and speaking to Iversen was not sufficient to warrant a reasonable belief by Iversen that he was not at liberty to ignore the officer's presence and go about his business. Up to the point where Iversen rolled down his window, all that had occurred was that the officer had driven his marked patrol car into the parking lot to see why a running vehicle with its headlights off was parked in a business parking lot at 1:30 a.m. The officer merely approached a parked vehicle, which the Fourth Amendment permits, and Iversen simply encountered a police officer in a public place. This conclusion is in accord with that reached by other courts in analyzing similar factual scenarios. *See, e.g.,* People v. Paynter, 955

P2d 68 (Colo 1998) (finding no Fourth Amendment seizure in an officer's late-night encounter with the driver of a vehicle legally parked on a city street over two blocks from the nearest commercial establishment still open for business); Overig v. Commissioner of Public Safety, 730 NW2d 789 (MinnCtApp 2007) (finding no Fourth Amendment seizure in an officer's encounter with the driver of the only vehicle parked in a ballroom parking lot in the middle of the night); State v. Gahner, 554 NW2d 818 (ND 1996) (finding no Fourth Amendment seizure in an officer's encounter with the driver of the lone car stopped in the parking lot of a sale barn in the middle of the night).

[¶20.] It follows from the above reasoning that the trial court did not err in denying Iversen's motion to suppress evidence.

[¶21.] Affirmed.

[¶22.] GILBERTSON, Chief Justice, and KONENKAMP, ZINTER, and MEIERHENRY, Justices, and SABERS, Retired Justice, participating.