#28569-a-DG
**2018 S.D. 86**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

     v.

TOBY ROLFE,                    Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE ROBERT A. MANDEL
Judge

\* \* \* \*

MARTY J. JACKLEY
Attorney General

ERIN E. HANDKE
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff
                                        and appellee.


ELLERY GREY of
Grey & Eisenbraun Law
Rapid City, South Dakota                    Attorneys for defendant
                                           and appellant.


\* \* \* \*

CONSIDERED ON BRIEFS
ON NOVEMBER 5, 2018
OPINION FILED **12/19/18**

#28569

GILBERTSON, Chief Justice

[¶1.]    Toby Rolfe appeals his judgment of conviction and sentence for third-degree rape. He asserts that the circuit court erred in denying his motion to suppress all evidence obtained from a warrantless search of his garage. Rolfe claims that he was unreasonably seized by police deputies before the search took place and that any consent given to search the garage after the seizure was invalid. We affirm.

## Facts and Procedural History

[¶2.]    Around 4:00 a.m. on September 28, 2016, an anonymous source in Box Elder placed a 911 call reporting she had witnessed an unconscious female being raped five minutes earlier. The caller informed the dispatcher that the female victim had dark hair, was between 20 and 30 years old, and had possibly been drugged. She described the two perpetrators as white males in their 30s wearing gray or black shirts. She specifically named Rolfe as one of the assailants. The caller claimed that the incident occurred inside a detached garage on Rolfe's property, which was across the street from her current location.

[¶3.]    Pennington County Sheriff's Deputies Jon Edwards and Josh Kunde were dispatched to Rolfe's home in Box Elder. When they arrived at the residence, the deputies observed that Rolfe's vehicle was parked on the premises, that the lights were dark in the house, and that lights and music were coming from the garage. Deputy Edwards approached the walk-through door of the garage and Deputy Kunde approached the roll-up door.

[¶4.] Both doors were closed, so each deputy knocked on the respective doors. Deputy Edwards stated, "This is the Sheriff's Office," and Deputy Kunde stated both that he was with the Sheriff's Office and that he was a fictional neighbor named Wayne. Deputy Kunde's deception was an attempt to get someone to come to the door. During this time, the deputies could hear two males speaking to each other inside, and heard them say "Go away," and "Fuck off." The deputies reported they had difficulty communicating with the garage occupants through the doors and were unsure whether the occupants knew they were law enforcement officers.

[¶5.] The deputies continued knocking on the doors for several minutes before anyone in the garage came to the door. When the occupants approached the door, Deputy Edwards spoke with them through the closed door. He identified himself as a deputy with the Pennington County Sheriff's Office and explained that they had received a report of an assault. At the end of the conversation, Marvin Payne, Rolfe's friend, opened the door while Rolfe stood behind him. Payne and Rolfe matched the description of the assailants given by the 911 caller. Deputy Edwards asked, "So can I come in and make sure there's not anyone who's like injured? Is that okay?" Payne immediately replied "Yeah, yeah, yeah" while Rolfe affirmatively nodded his head up and down. Before the deputies entered, Payne stated that there was a girl inside the garage who was passed out.

[¶6.] The deputies entered the garage. Inside, Deputy Edwards observed two legs sticking out from underneath an air hockey table. He soon discovered an unconscious female underneath the table that matched the description of the victim

he received from dispatch. The female was naked from the abdomen down. Deputy Edwards could not feel the woman's pulse, and she remained unconscious despite the efforts of both deputies to wake her up. Deputy Edwards called for an ambulance and the woman was transported to the hospital for medical care.

[¶7.]     Both Rolfe and Payne were placed under arrest. During a search incident to the arrests, Deputy Kunde found a cell phone in Payne's front pocket. A search of the cell phone made pursuant to a warrant uncovered pictures of the apparently unconscious female being sexually penetrated. On October 12, 2016, a Pennington County grand jury indicted Rolfe on one count of third-degree rape in violation of SDCL 22-22-1(3).

[¶8.]     Rolfe filed several pre-trial motions, including a motion to suppress evidence of the cell phone pictures and the observations of the deputies. Rolfe argued he was unreasonably seized when the deputies were pounding on the garage door and stating "Sheriff's Office, open the door," and that any evidence obtained as a result of the unreasonable seizure should be suppressed. The State argued Rolfe and Payne were not seized, and that both Payne and Rolfe had given valid consent to enter the garage and search the premises without a warrant. At a hearing on May 12, 2017, the circuit court orally denied Rolfe's motion. The court held that Rolfe and Payne were not seized when they first encountered the deputies and had validly consented to the deputies' entrance into the garage. The court entered a written order denying Rolfe's motion to suppress on June 13, 2017. Rolfe filed a motion to reconsider the motion to suppress, but the court again denied the motion on the same bases.

[¶9.]    Rolfe waived his right to a jury trial and agreed to a bench trial based on stipulated facts.  The circuit court convicted Rolfe of third-degree rape.  The State dismissed the part II information as well as an unrelated petty theft charge.  The circuit court sentenced Rolfe to 25 years in prison with 17 years suspended.  Rolfe appeals his conviction and sentence and asks this Court to determine whether the circuit court erred in denying his motion to suppress evidence.

## Standard of Review

[¶10.]    "We review the denial of a motion to suppress based on the alleged violation of a constitutionally protected right as a question of law by applying the de novo standard of review."  *State v. Bowers*, 2018 S.D. 50, ¶ 9, 915 N.W.2d 161, 164 (quoting *State v. Doap Deng Chuol*, 2014 S.D. 33, ¶ 19, 849 N.W.2d 255, 261).  "We review the circuit court's factual findings for clear error.  Once the facts have been determined, we give no deference to the court's application of a legal standard to those facts.  Those questions of law are reviewed de novo."  *State v. Kleven*, 2016 S.D. 80, ¶ 7, 887 N.W.2d 740, 742 (citations omitted).

## Analysis & Decision

[¶11.]    At the hearing on Rolfe's motion to suppress evidence, the State argued that the deputies' entry into Rolfe's garage was justified because Rolfe and Payne were not seized before opening the garage door, and because Payne, an overnight guest of Rolfe's, voluntarily consented to open the garage door and let the deputies into the garage.  The circuit court agreed with the State and denied the motion to suppress.  Rolfe argues that the facts of this case establish that Rolfe and Payne were unlawfully seized for purposes of the Fourth Amendment as soon as the

deputies began pounding on the garage doors and windows and commanding, "Sheriff's Office, open the door." Because this unlawful seizure occurred before the deputies asked to enter the garage, Rolfe claims that the entry could not have been based on voluntary consent. Rolfe therefore asserts that any evidence seized as a result of Payne's consent should be suppressed.

[¶12.] The right to be free from unreasonable searches and seizures is guaranteed by the United States Constitution and the South Dakota Constitution. U.S. Const. amend. IV; S.D. Const. art. VI, § 11. "The Fourth Amendment's prohibition against unreasonable searches and seizures requires generally the issuance of a warrant by a neutral judicial officer based on probable cause prior to the execution of a search or seizure of a person." *State v. Fierro*, 2014 S.D. 62, ¶ 15, 853 N.W.2d 235, 240 (quoting *State v. Smith*, 2014 S.D. 50, ¶ 15, 851 N.W.2d 719, 724). "Warrantless searches are per se unreasonable, apart from a few, well-delineated exceptions." *Id.* (quoting *Smith*, 2014 S.D. 50, ¶ 15, 851 N.W.2d at 724). "[I]t is the State's burden to prove that the search at issue falls within a well-delineated exception to the warrant requirement." *Id.*

***Whether Rolfe and Payne Were Seized***

[¶13.] We first address Rolfe's assertion that he and Payne were unreasonably seized well before Payne gave police consent to enter Rolfe's garage. "[N]ot every encounter between a citizen and the police constitutes a Fourth Amendment seizure." *State v. Iversen*, 2009 S.D. 48, ¶ 9, 768 N.W.2d 534, 536. "Only when an officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may a court conclude that a 'seizure' has

occurred." *Id.* ¶ 10, 768 N.W.2d at 536-37 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 1879 n.16, 20 L. Ed. 2d 889 (1968)).  This Court has adopted the reasoning of the United States Supreme Court in saying that:

> a seizure does not occur simply because a police officer approaches an individual and asks a few questions.  So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required.  The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature.

*See id.* ¶ 12, 768 N.W.2d at 537 (quoting *Florida v. Bostick*, 501 U.S. 429, 433, 111 S. Ct. 2382, 2385, 115 L. Ed. 2d 389 (1991)).

[¶14.]     Rolfe cites two cases in support of his proposition that he and Payne were seized as soon as the deputies began pounding on the doors and windows and commanding them to open the door.  *See United States v. Reeves*, 524 F.3d 1161, 1164-69 (10th Cir. 2008) (holding defendant was unlawfully seized under the Fourth Amendment when he opened his motel room door after police had yelled and knocked on the doors and windows of the room with metal police flashlights for 20 minutes); *United States v. Jerez*, 108 F.3d 684, 691-93 (7th Cir. 1997). (holding defendant was seized after opening his door after police knocked on his door for three minutes and window for two minutes, identified themselves as officers, and shined a flashlight in the window).  Similar to these cases, Rolfe argues that the actions of the deputies in knocking on the garage doors and windows and commanding Rolfe and Payne to open them for about five minutes constituted an unreasonable seizure.  Rolfe also claims that, under the totality of the circumstances, no reasonable person in Rolfe and Payne's position would have

believed that they could disregard the deputies' commands and go about their business.

[¶15.] Here, the circuit court made several key findings as to Rolfe and Payne's encounter with the deputies. The court found that

> [i]nitially, the deputies had a difficult time communicating with the individuals inside the garage. While knocking, Deputy Edwards stated, "This is the Sheriff's Office," while Deputy Kunde stated both that he was with the Sheriff's Office and that he was a fictional neighbor named "Wayne" in an effort to get someone to answer the door. During this time, the deputies could hear two males speaking to each other inside and could hear them say, "Go away," and "Fuck off" while knocking. Due to the difficulty communicating with each other through the garage door and walls while loud music was playing, the deputies were unsure whether the individuals inside the garage knew they were law enforcement officers.

The court also found that

> [w]hen the occupants of the garage came closer to the door where Deputy Edwards was standing, communication became easier. As Deputy Edward explained, 'Once they came to the door and we were able to communicate . . . through the closed door, that we were the Sheriff's Office and that we were there to look for the victim of an assault, then . . . we just had a normal conversation.'

Finally, the circuit court found that shortly after speaking with the deputies through the door, Payne opened the door and had a "cordial" encounter with the deputies, who remained outside. At that point, Payne told the officers they could enter.

[¶16.] A review of the record, especially the audio of the encounter taken from the deputies' dash cams, shows that the circuit court's findings were free of clear error. It appears, as the circuit court surmised, that the deputies heard voices inside of the garage almost immediately after their arrival, but were having

difficulty communicating with those inside. This communication was further complicated by Deputy Kunde's deceptive tactic of announcing himself as being a neighbor named "Wayne." Thereafter, the deputies continued knocking and announcing themselves as being with the Sheriff's Office. Contrary to Rolfe's claims, the period of time from when the first knock on the garage can be heard, to when Deputy Edwards can be heard beginning a strained conversation with an occupant inside the garage, was less than two minutes. The difficulty in communicating and the very short timeframe between the first knock and the consensual conversation through the garage's walk-through door distinguishes this case from both *Reeves*, 524 F.3d at 1164-69, and *Jerez*, 108 F.3d at 691-93. We conclude that the deputies' actions were reasonable and that Rolfe and Payne were not seized as soon as the encounter began.

### Whether Rolfe and Payne Voluntarily Consented to Entry

[¶17.] Because we conclude that Rolfe and Payne were not seized, we proceed to review the State's contention that there was voluntary consent to enter the garage. The State asserts that Rolfe and Payne were not seized and that Payne's words and actions when he allowed the deputies into Rolfe's garage constituted voluntary consent.

[¶18.] Consent is an exception to the warrant requirement. *See State v. Hemminger*, 2017 S.D. 77, ¶ 23, 904 N.W.2d 746, 754. "Whether a valid consent to search exists is generally a question of fact for the trial court." *Id.* ¶ 16, 904 N.W.2d at 752 (quoting *State v. Akuba*, 2004 S.D. 94, ¶ 25, 686 N.W.2d 406, 417).

> For consent to be valid, the State must prove by a
> preponderance of the evidence that it was voluntarily given.

> The voluntariness of consent is a factual question based on the totality of the circumstances. The totality of the circumstances includes the conditions wherein the consent was obtained, the officer's conduct, and the duration, location, and time of the event as well as the accused's age, maturity, education, intelligence, and experience.

*Id.* ¶ 23, 686 N.W.2d at 754. "Whether the accused knew that he possessed a right to refuse consent also is relevant to determining the voluntariness of the consent." *Id.* (quoting *State v. Castleberry*, 2004 S.D. 95, ¶ 9, 686 N.W.2d 384, 387). "But the State need not prove that defendant knew of the right to refuse consent to show that the consent was voluntary." *Id.* (quoting *Castleberry*, 2004 S.D. 95, ¶ 9, 686 N.W.2d at 387). "[C]onsent need not be explicit—it can be inferred from words, gestures, and other conduct." *Id.* ¶ 24. "The standard for assessing whether consent was coerced or voluntary is one of objective reasonableness." *Id.* ¶ 23.

[¶19.] Here, the record shows that Payne engaged in a consensual conversation with the deputies through the closed walk-through garage door minutes after their arrival. When Deputy Edwards explained the situation, Payne voluntarily opened the walk-through door. As the door opened, Deputy Edwards observed Payne and saw Rolfe standing behind and to the right of Payne. Deputy Edwards asked Payne if he could enter the garage and look for a victim of alleged assault. Payne replied "Yeah, yeah, yeah," and Rolfe simultaneously nodded his head affirmatively.

[¶20.] Deputy Edwards testified that the entire encounter at the doorway was cordial, and that no physical force was used to gain entry to the garage. The encounter lasted for a brief time before Payne and Rolfe allowed the deputies to enter. As to Rolfe, consent to enter the garage could be inferred from his gesture of

nodding affirmatively when Payne gave the deputies permission to enter. Rolfe's age and experience with law enforcement supports his ability to consent. At the time of the encounter, he was 43 years old and had previous experience with law enforcement, having been convicted of four prior DUIs. Based on the totality of the circumstances, Rolfe's consent to search the garage was voluntary.

## Conclusion

[¶21.]     Because both Rolfe and Payne were not seized for purposes of the Fourth Amendment at the beginning of their encounter with the deputies, and because both Payne and Rolfe's consent to search the garage was voluntary, the circuit court did not err in denying Rolfe's motion to suppress evidence.

[¶22.]     KERN, JENSEN and SALTER, Justices, concur.