#24988-r-PER CURIAM

**2009 SD 79**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA, Plaintiff and Appellee,

v.

SEAN P. HAAR, Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT
OF THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

* * * *

HONORABLE WARREN G. JOHNSON
Judge

* * * *

LAWRENCE E. LONG
Attorney General

SHERRI SUNDEM WALD
Deputy Attorney General
Pierre, South Dakota                          Attorneys for plaintiff
                                               and appellee.


MATTHEW J. KINNEY
Spearfish, South Dakota                       Attorney for defendant
                                               and appellant.

* * * *

CONSIDERED ON BRIEFS
ON APRIL 27, 2009

OPINION FILED **08/26/09**

#24988

PER CURIAM

[¶1.]        Sean Haar appeals from the circuit court's denial of his motion to
suppress evidence seized as a result of a canine sniff of his vehicle at an interstate
highway rest area.  We reverse.

*Facts and Procedural History*

[¶2.]        On February 26, 2008, at approximately 3:20 p.m., South Dakota
Highway Patrolman Brian Swets pulled into an interstate rest area located on
Interstate 90, a few miles east of Beulah, Wyoming and approximately ten miles
west of Spearfish, South Dakota.  Upon entering the rest area, Swets observed a
Subaru Outback station wagon with Illinois license plates and a cargo box mounted
on the top of the vehicle.  Although there was only one other vehicle in the rest area
(a semi-tractor and trailer), Swets parked his patrol vehicle "just a few feet" from
the Subaru, leaving his vehicle partially in the travel lane of traffic across a number
of the designated parking spaces with the back of his vehicle close to the Subaru's
driver's side.  Because of the close proximity of the two vehicles, the driver of the
Subaru would have had to have backed out toward the entrance of the rest area and
then driven around Swets's vehicle to leave.

[¶3.]        After parking in this manner, Swets walked along the back driver's
side of the Subaru.  He observed the following items inside the Subaru:

- A luggage compartment cover drawn over the rear
  cargo area.

- A black duffel bag in the cargo area (beneath the
  cover).

- A ski vest hanging from a hanger on the driver's
  side, rear passenger's window.

- A City of Chicago vehicle sticker on the windshield.

- Two cellular telephones in the front passenger area.

- A woman's purse or large bag.

- Food items.

- A Red Bull brand beverage.

[¶4.] After walking past the rear of the Subaru, Swets proceeded toward the rest area building. As he approached the building, he observed a male, later identified as Haar, leaving the building. As the two met, they exchanged greetings. Swets testified that the man appeared nervous as he continued walking.

[¶5.] Swets indicated that at this point he did not know who was driving the Subaru. He continued to walk toward the building, but before reaching it, he turned around and saw Haar approach the Subaru. Swets immediately returned to the Subaru and initiated a conversation with Haar in front of the vehicle. Swets positioned himself between Haar and the driver's side door of the Subaru.

[¶6.] Swets asked if they could speak, who owned the Subaru, and "where [Haar] was traveling from." Haar indicated that he owned the Subaru and he was coming from "out west." Swets then informed Haar that Swets "had some concerns about some things that [he] saw in [Haar's] vehicle, and that part of what [Swets did] with the Highway Patrol is that [he was] a dog handler." Haar did not respond. Swets then "asked [Haar] if there was anything illegal in his vehicle and if my dog would smell the odor of illegal drugs coming from his vehicle." Haar replied in the negative. Next, Swets "asked if there was anything in the vehicle that he wanted to tell me about. Anything illegal." Haar again replied in the negative. Swets then

"indicated to [Haar] that a lot of times I—you know, vehicles are parked in a rest area, not moving, sometimes I might take my dog around the vehicle to check for the odor of an illegal drug. Um, I asked him if he had a problem with me doing that." Haar did not consent.

[¶7.]      While standing between the Subaru and Haar, Swets then told Haar and the other occupant of the vehicle they were "free to go." This statement was, however, conditional. Swets testified that although he had no prior information about the vehicle or its occupants, and although he observed no illegal substances, he had "a reasonable suspicion of an illegal activity in progress," *i.e.* drug trafficking. Therefore, Swets later explained that by "free to go," he meant that Haar was physically free to *walk* away from Swets's presence. Swets conceded that Haar would have had "difficulty" accessing his vehicle or recovering any of his other possessions. When pressed as to whether Haar could have gotten in his car and driven away at that time, Swets would only indicate that Haar was "free to try to get in his car and leave." Swets's testimony ultimately reflected that Haar was only free to walk away from the rest area or "[h]e could have got into another vehicle and drove off." This was at a time when there were no other automobiles in the rest area, Haar was wearing a short sleeve shirt, the temperature was less than thirty degrees, and the nearest town was miles away.

[¶8.]      Moreover, although Swets told Haar he was "free to go," Swets simultaneously released his drug dog from the patrol vehicle by the use of a remote control device. The dog immediately began a drug sniff on the driver's side of the Subaru. Swets was wearing his Highway Patrol uniform and sidearm. Swets, a

#24988

claimed student of the law in this area, conceded that the encounter constituted "a show of authority."

[¶9.]        The dog "indicated" to the presence of illegal drugs within seven seconds. The dog's indication led to a warrantless search of the vehicle. This search revealed a large quantity of marijuana, drug paraphernalia, and some Vicodin.

[¶10.]        After a pre-trial motion hearing, the circuit court denied Haar's motion to suppress. The court concluded that the canine sniff and resulting search were permissible as a brief detention incident to a lawful traffic stop. Following a court trial, Haar was found guilty of possession of more than one pound of marijuana with intent to distribute, possession of more than ten pounds of marijuana, and possession of a controlled drug or substance. Haar appeals from the denial of his motion to suppress.

*Decision*

[¶11.]        Haar argues that the canine sniff occurred during an encounter that was a seizure or detention under the Fourth Amendment. He further argues that Officer Swets's detention was not based on reasonable suspicion. Therefore, Haar contends that the evidence was seized as the result of an unlawful detention, requiring suppression under *Wong Sun v. United States*, 371 US 471, 83 SCt 407, 9 LEd2d 441 (1963).

[¶12.]        Our standard of review in this area is well established:

> When a motion to suppress evidence is based on an alleged violation of a constitutionally protected right, we apply the de novo standard to our review of the circuit court's decision to grant or deny that motion. State v. Labine, 2007 SD 48, ¶12, 733 NW2d 265, 268-269. "While we review the [circuit] court's findings of fact under the clearly erroneous standard, we give no

- 4 -

> deference to its conclusions of law and thereby apply the de novo standard." State v. Condon, 2007 SD 124, ¶15, 742 NW2d 861, 866 (citation omitted).

State v. Wendling, 2008 SD 77, ¶8, 754 NW2d 837, 839. In this case, the facts are uncontested. Haar only challenges the legal conclusions drawn from the uncontested facts. Therefore, we review this matter *de novo*. However, before considering the merits of the Fourth Amendment issue, we address one procedural matter.

[¶13.]    The parties extensively rely on the circuit court's memorandum decision. This is significant because, in the memorandum decision, the court concluded that the encounter was consensual rather than a Fourth Amendment seizure or detention. However, in its formal findings of fact and conclusions of law, the court determined that the encounter was a nonconsensual detention in that a reasonable person in Haar's circumstances "would not have felt free to leave." Conclusion of Law ¶3. Furthermore, the memorandum decision was not incorporated into the court's findings of fact and conclusions of law or order. Under these circumstances:

> The specific findings of fact and conclusions supersede the memorandum and articulate the trial court's final and determinative thoughts. . . . It is settled law that we do not review the trial court's memorandum opinion unless the same is expressly incorporated in the trial court's findings of fact and conclusions of law. Since the memorandum was not incorporated, and cannot be used, our review is limited to the findings of facts and conclusions of law.

State v. Labine, 2007 SD 48, ¶16, 773 NW2d 265, 269-70 (internal citations and quotations omitted).

[¶14.]    With respect to the merits of the Fourth Amendment issue, the circuit court upheld the canine sniff and resulting search, reasoning that "a brief detention, *incidental to a valid traffic stop,* for a canine sniff . . . is permissible." (Conclusions of Law ¶5) (emphasis added) (citing State v. DeLaRosa, 2003 SD 18, 657 NW2d 683). Although this is a correct statement of law, there is no dispute that a valid traffic stop did not occur because Swets concededly observed no traffic violations.[1] Therefore, unlike *DeLaRosa* and other traffic stop cases, there was no traffic violation to justify any detention. *Compare DeLaRosa*, 2003 SD 18, ¶10, 657 NW2d *at* 687 (upholding a canine sniff and subsequent search in part because there was no question that the initial stop of the vehicle was based upon the officer's eyewitness observation of a traffic violation). For this reason, the circuit court erred in concluding that Swets's encounter with Haar, if constituting a detention to conduct the canine sniff, was justified as incident to a valid stop for a traffic violation.[2]

---

1.    Indeed, although inconsistent with Conclusion of Law ¶5, the circuit court earlier determined that "Trooper Swets['s] contact with [Haar] was *not the product of a traffic stop*." Conclusions of Law ¶3 (emphasis added).

2.    The circuit court also erred in reasoning that a number of cases have concluded that canine sniffs not incident to a traffic stop are subject to the same rules as sniffs conducted incident to a traffic stop. The circuit court's cited cases all involved canine sniffs that were either incident to a traffic stop or involved parked and unattended cars in public places where the defendant had no expectation of privacy. None of the court's cited cases involved what is alleged here: an investigatory *detention* of persons or property *performed to* conduct a canine sniff. *See e.g.* United States v. Engles, 481 F3d 1243, 1245 (10thCir 2007) (holding dog sniff of a vehicle parked on a public street did not violate the Fourth Amendment when canine sniff was conducted after the driver was validly stopped and arrested for driving on a suspended license); United States v. Friend, 50 F3d 548, 551-52 (8thCir 1995) (holding

(continued . . .)

#24988

[¶15.]    In *State v. Ballard*, 2000 SD 134, 617 NW2d 837, we set forth the

general principles underlying brief detentions of property to conduct canine sniff's

when a traffic stop is no longer the basis for the detention:

> The Fourth Amendment to the United States Constitution and
> Article VI § 11 of the South Dakota Constitution protect the
> "right of the people to be secure in their persons, houses and
> effects, against unreasonable searches and seizures. . . ." As a
> rule, this protection has been interpreted as holding "a seizure of
> personal property . . . per se unreasonable . . . unless it is
> accomplished pursuant to a judicial warrant issued upon
> probable cause. . . ." United States v. Place, 462 US 696, 701,
> 103 SCt 2637, 2641, 77 LEd2d 110 (1983). In *Terry v. Ohio,*
> however, the United States Supreme Court recognized "the
> narrow authority of police officers who suspect criminal activity
> to make limited intrusions on an individual's personal security
> based on less than probable cause." *Id.* at 702, 103 SCt at 2642,
> 77 LEd2d at 117.

*Id. at* ¶10, 617 NW2d at 840. In *DeLaRosa*, we explained that if the limited

intrusion becomes a *Terry* investigatory detention of persons or property,

reasonable suspicion must justify the detention:

> The *Terry* line of cases establishes that when a person is subject
> to an "investigative detention" rather than a full-blown custodial
> arrest, the officer need only have reasonable suspicion for the

_____

(. . . continued)

canine sniff of an unattended vehicle parked outside the curtilage of
defendant's home was not a search within the meaning of the Fourth
Amendment); Willoughby v. State, 76 Ark App 329, 65 SW3d 453, 456 (2002)
(holding canine sniff of commercial truck parked at weigh station during a
routine safety inspection was not a violation of the Fourth Amendment);
United States v. Carroll, 537 FSupp2d 1290, 1293, 1296 (NDGa 2008)
(holding no Fourth Amendment violation when police initiated a canine sniff
of a trailer attached to a pickup truck that was parked and unattended on a
public street); State v. Wilkenson, 118 Ohio Misc2d 10, 769 NE2d 430, 436
(2001) (holding canine sniff of a vehicle validly stopped for a headlight
violation was not unreasonable given that the driver was being issued a
ticket at the time a second officer arrived on the scene and ran the drug dog
around the vehicle).

detention rather than the probable cause typically required. An investigatory stop satisfies the Fourth Amendment if the officer's action is supported by reasonable suspicion to believe that criminal activity "may be afoot."

2003 SD 18, ¶7, 657 NW2d at 685-86 (citing Terry v. Ohio, 392 US 1, 30, 88 SCt 1868, 1884-85, 20 LEd2d 889 (1968)). This is a recognition "that [while] in some circumstances a person may be detained briefly, without probable cause to arrest him, any curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." Reid v. Georgia, 448 US 438, 440, 100 SCt 2752, 2754, 65 LEd2d 890 (1980). Thus, as the Sixth Circuit Court of Appeals concluded in a similar canine sniff case, the Fourth Amendment is violated when there is no traffic stop or other justification for a canine sniff that is made possible by a *Terry* detention conducted without reasonable suspicion. United States v. Buchanon, 72 F3d 1217, 1227 (6thCir 1995).[3] The Sixth Circuit explained:

---

3.      *Buchanon* involved the same question presented in this case. A federal district court concisely explained *Buchanon* as follows:

> In [*Buchanon*], there was no hint of wrongdoing by those in the vehicle and no traffic stop was involved--instead, a vehicle, apparently disabled at the side of the road, prompted an officer to pull over to inquire and offer assistance. 72 F3d at 1219. Despite the absence of any violation, the officer caused the vehicle to remain where it was, and called another police unit to carry out a dog sniff investigation on it. *Id.* There was no indication that the troopers asked permission or that anyone in the vehicle consented to this procedure. *Id.* There, as here, the dog "alerted" from outside the vehicle . . . [T]he troopers performed a warrantless search of the vehicle. In *Buchanon*, the court stated that:

(continued . . .)

> So long as [an officer] uses [a drug dog] on an unattended vehicle or unattended personal property, or so long as the canine sniff is performed on legally seized personal property pursuant to a legal seizure of a person, the [canine] sniff would not be unconstitutional. . . . [But], a canine narcotics sniff made possible by an unconstitutional *Terry* seizure violates the Fourth Amendment.

*Id.* This is consistent with our precedent stating that when the canine sniff is performed in connection with a motorist encounter, the threshold question is "whether the officer's action was justified at its inception[.]" *DeLaRosa*, 2003 SD 18, ¶12, 657 NW2d at 688 (citing *Terry,* 392 US at 19-20, 88 SCt at 1879, 20 LEd2d 889).

[¶16.]     Therefore, we must determine whether Swets's intrusion was justified at the time of the canine sniff. Because the canine sniff was not incident to a valid traffic stop, we must first determine whether the encounter at the time of the sniff was consensual or whether it constituted a *Terry* detention. If the encounter was consensual, there need be no further justification for the intrusion. If, however, the encounter constituted a *Terry* detention of person or property, we then must determine whether that detention or seizure was justified by reasonable suspicion.

---

(. . . continued)

> [t]he troopers testified that they did not observe any illegal activity prior to the dog's alert and that they relied exclusively on the dog's alert in concluding that probable cause existed to search the vehicle.

United States v. Taylor, 955 FSupp 763, 766 (EDMich 1997) (quoting *Buchanon*, 72 F3d at 1219-20) (internal citations omitted).

*Terry Seizure*

[¶17.]    We have recently distinguished consensual encounters and *Terry* detentions or seizures:

> Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free "to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required." . . . "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority,[4] has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."

State v. Iversen*, 2009 SD 48, ¶12, 768 NW2d 534, 537 (quoting Florida v. Bostick, 501 US 429, 433, 111 SCt 2382, 2385, 115 LEd2d 389 (1991)). In applying this rule to citizens who are traveling in open public areas, the Supreme Court approved an inquiry focused on whether the individual would feel free to continue their journey unimpeded: "When police attempt to question a person who is walking down the street or through an airport lobby, it makes sense to inquire whether a reasonable person would feel free to continue walking." *Bostick*, 501 US at 435, 111 SCt at 2387, 115 LEd2d 389. "[T]he crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Id*. (citing Michigan v. Chesternut*, 486 US

---

4.    "The test for the existence of a show of authority is an objective one, asking whether the officer's words and actions would have conveyed to a reasonable person that he was being ordered to restrict his movement." State v. Almond, 511 NW2d 572, 574 (SD 1994) (citing California v. Hodari D.*, 499 US 621, 627-28, 111 SCt 1547, 1551, 113 LEd2d 690 (1991)).

567, 569, 108 SCt 1975, 1977, 100 LEd2d 565 (1988)). "Some circumstances which inform our decision-making include: officers positioning themselves in a way to limit the person's freedom of movement, . . . the presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation indicating compliance is necessary, the officer's retention of the person's property, or an officer's indication the person is the focus of a particular investigation[.]" United States v. Griffith, 533 F3d 979, 983 (8thCir 2008) (citations omitted). Finally, as is particularly significant here, when examining initial encounters "[a suspect] may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." Florida v. Royer 460 US 491, 498, 103 SCt 1319, 1324, 75 LEd2d 229 (1983) (citing United States v. Mendenhall, 446 US 544, 556, 100 SCt 1870, 1878, 64 LEd2d 497 (1980)).

[¶18.] In considering the nature of the encounter in this case, the circuit court concluded:

> Trooper Swets'[s] contact, at least initially, was consensual. At the moment when Swets told Haar he was a canine handler and asked if the dog would smell the [odor] of illegal drugs coming from the vehicle, *a reasonable person, at that time and place, would not have felt free to leave.*

(Conclusions of Law ¶4) (Emphasis added). On appeal, the State argues that the encounter was entirely consensual and that Haar was free to walk away. Haar argues that a seizure was affected by Swets's conceded "show of authority," which Haar alleges would have led a reasonable person to believe that he or she was not free to disregard the officer and go about his or her business. Although we disagree

with the circuit court to the extent its conclusion suggests, as a general proposition, that an encounter becomes nonconsensual at the moment a law enforcement officer asks for consent to conduct a canine sniff,[5] we agree that this initially consensual encounter became a seizure or detention when Swets's show of authority caused Haar to believe he was not free to get into his car and leave.

[¶19.] First, Swets specifically admitted that the encounter constituted a "show of authority." There is no dispute that Swets was in uniform, he was wearing his handgun, and he had parked his patrol vehicle and positioned himself in a manner that would have made it difficult for Haar to leave in his vehicle after he declined to consent to a dog sniff. Indeed, Swets testified that Haar would not have been able to enter or drive his Subaru out of the rest area, even though he was told he was "free to go." Swets explained ". . . as I deployed my dog, [simultaneously with the "free to go statement"] . . . it would have been probably hard for him to get in his vehicle and drive away at that time." Thus, Swets admitted that he "interfered with the . . . vehicle's egress so that it could not be driven away if the driver so desired." *Compare Iversen,* 2009 SD 48, ¶17, 768 NW2d at 538-39 (finding

---

5.  *See Almond*, 511 NW2d at 575 (concluding that "even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, ask to examine the individual's identification, and request consent to search his or her luggage--*as long as the police do not convey a message that compliance with their requests is required"*) (citing *Bostick,* 501 US at 434, 111 SCt at 2386, 115 LEd2d 389 (citations omitted) (emphasis added)). *See also Royer*, 460 US at 497, 103 SCt at 1324, 75 Ed2d 229 (concluding that "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.").

no detention or seizure of a parked automobile and its occupants in part because there was no showing that the patrol car interfered with the other vehicle's egress so that it could not be driven away). Further, according to Swets, Haar was only "free" to leave his vehicle and walk away from the rest area. Thus, Swets conceded that he had seized Haar's property within the meaning of *Terry*.

[¶20.] In addition, we agree with the circuit court that Haar was detained or seized because a reasonable person in his position would not have felt free to leave or terminate the encounter. Haar and the other occupant were alone at the rest area without the ability to leave in their vehicle. Further, Swets parked his vehicle, positioned himself, questioned Haar, and released the dog in a manner such that a reasonable person would not feel he or she was free to leave. Under the totality of the circumstances, we agree with the circuit court that any initially consensual encounter became an investigatory detention. The circumstances justifying this conclusion include the remote location of the encounter, Haar's restricted access to his vehicle and jacket on a cold February day, the investigatory nature of the conversation, Swets's conceded show of authority, and the release of the dog. Even disregarding Swets's concession, his actions amounted to a show of authority such that a reasonable person would not have felt free to leave. *See Royer*, 460 US at 501-02, 103 SCt at 1326, 75 LEd2d 229 (concluding that analogous actions by law enforcement with respect to an airport traveler surely amounted to a show of official authority such that "a reasonable person would have believed he was not free to leave").

[¶21.] Although we acknowledge that Swets told Haar he was "free to go," the seizure of the car together with the simultaneously release of the dog made this statement demonstrably false. Furthermore, the release of the dog left no room for a reasonable person to believe that he or she could have disregarded Swets's command to the dog, disrupted the canine sniff, and left in his or her vehicle uninterrupted. We conclude that Swets affected a *Terry* detention or seizure of Haar and his vehicle.

*Reasonable Suspicion*

[¶22.] Having concluded that there was a *Terry* detention or seizure, we must next determine whether the seizure was justified by reasonable suspicion, "[f]or 'what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.'" *Terry*, 392 US at 9, 88 SCt at 1873, 20 LEd2d 889 (quoting Elkins v. United States, 364 US 206, 222, 80 SCt 1437, 1446, 4 LEd2d 1669 (1960)). The critical question is, "would the facts available to the officer at the moment of the seizure . . . warrant a man of reasonable caution in the belief that the action taken was appropriate? Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction." *Terry*, 392 US at 21-22, 88 SCt at 1880, 20 LEd2d 889 (quotations and internal citations omitted). Consequently, there must be:

> [A] showing of reasonable articulable suspicion before law enforcement is permitted to detain or seize an item for purposes of investigation, i.e., to establish probable cause. If officers do not have a reasonable articulable suspicion sufficient to justify detaining an item, any subsequent search of the item will be

> held unconstitutional even though probable cause was later established.

United States v. Escobar, 389 F3d 781, 784 (8thCir 2004) (internal citation omitted).[6]

[¶23.] In making the reasonable suspicion determination, reviewing courts "must look at the 'totality of the circumstances' to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Arvizu, 534 US 266, 273, 122 SCt 744, 750-51, 151 LEd2d 740 (2002) (internal citations omitted). "[C]ourts should not[, therefore,] examine innocent explanations for the reasonable suspicion factors standing alone, a process which the Supreme Court described as a 'divide-and-conquer' analysis." State v. Quartier, 2008 SD 62, ¶15, 753 NW2d 885, 889 (citing Arvizu, 534 US at 274, 122 SCt at 751, 151 LEd2d 740).

[¶24.] As mentioned above, the facts are undisputed. In considering all of the factors together, we first note that Swets observed no traffic or equipment violations, no signs of intoxication or impairment, and no odors of illegal substances during the encounter. Further, he had no prior knowledge, communication, dispatch or tip regarding this vehicle before seeing it at the rest area. Nevertheless, he candidly admitted that he had suspicions about the vehicle immediately upon

---

6. The circuit court entered no findings of fact or conclusions of law on this issue because it erroneously concluded that the canine sniff was performed incident to a traffic stop. Because the facts are not in dispute, we consider this issue *de novo. See supra* ¶11.

seeing it in the parking lot, even before he had stopped his patrol car. At that time, Swets testified that his suspicions were aroused by the rooftop cargo box, the lack of visible luggage, and the out-of-state license plate. We fail to see, however, even under the admonitions of *Arvizu* and *Quartier,* how a cargo box, the lack of visible luggage in a vehicle that had a cover designed to hide the luggage, and an out-of-state license plate on a vehicle in an interstate rest area provide any articulable basis upon which a reasonable person would have suspected that the Subaru was transporting illegal drugs.

[¶25.]     Swets also believed he had a reasonable suspicion based on Haar's demeanor and the objects he had observed in the vehicle. Nervous, evasive behavior can be a pertinent factor in determining reasonable suspicion. Illinois v. Wardlow, 528 US 119, 124, 120 SCt 673, 676, 145 LEd2d 570 (2000) (citing United States v. Brignoni-Ponce, 422 US 873, 885, 95 SCt 2574, 45 LEd2d 607 (1975); Florida v. Rodriguez, 469 US 1, 6, 105 SCt 308, 83 LEd2d 165 (1984); United States v. Sokolow, 490 US 1, 8-9, 109 SCt 1581, 104 LEd2d 1 (1989)). With regard to Haar's alleged "unusually nervous reaction to [Swets's] presence" and his demeanor during their conversation, Swets testified that he had merely observed that:

> [Haar] was uneasy. Um, his facial expression was that of a nervous person, and his general mannerisms, the way he spoke. Everything. I mean, there's not – I guess I have a hard time articulating sometimes. It's the whole picture. It's everything that's going on there that would indicate to me that a person is nervous.

There was, however, no indication that nervousness occurred as a result of the questioning regarding drugs, and more importantly, Swets conceded he could not "articulate" the basis for this allegation. Furthermore, Swets described Haar as

- 16 -

"cooperative throughout the entire process" and noted that he did not resist, evade, or avoid the investigation.

[¶26.] Swets's only other basis for suspicion was: a car traveling from a drug source city probably destined for Chicago, a drug destination; two cellular telephones; an energy beverage; food; and a duffel bag in the luggage area of the car. With respect to the drug route, we note that although Swets indicated he was aware of a drug route from California, Seattle, Washington and British Columbia to Chicago, he articulated no basis to believe the Subaru was coming from any of those locations. Haar had only disclosed that he was coming from "out west." Further, when a traveler is not otherwise engaged in suspicious activity, an officer's mere observation that the person was travelling from a "major source city" is insufficient to provide reasonable suspicion for an investigatory detention. *Mendenhall*, 446 US at 572-73, 100 SCt at 1886, 64 LEd2d 497 (citing Ybarra v. Illinois, 444 US 85, 100 SCt 338, 62 LEd2d 238 (1979); Brown v. Texas, 443 US 47, 51, 99 SCt 2637, 2641, 61 LEd2d 357 (1979); Sibron v. New York, 392 US 40, 62, 88 SCt 1889, 1902, 20 LEd2d 917 (1968)).

[¶27.] With respect to the other items observed in the vehicle, we believe that the reasonable suspicion determination is controlled by *Reid*, 448 US at 441, 100 SCt at 2754, 65 LEd2d 890. In *Reid*, the Supreme Court considered an investigatory stop of a traveler who allegedly met the Drug Enforcement Administration's profile of a drug courier: he was observed in an airport concourse; he preceded another individual, occasionally looking back; he arrived from another city that was a principal place of origin for cocaine; he arrived in the early morning

when law enforcement activity was diminished; he and his companion appeared to be trying to conceal the fact they were traveling together; he and his companion apparently had no luggage other than shoulder bags; and, he and his companion appeared nervous. The Supreme Court held that under those facts, the only evidence of conduct particular to the defendant was his nervous relationship with his companion. *Id*. Notwithstanding the nervousness, the Supreme Court concluded:

> The other circumstances describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure. . . . Although there could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot, *see Terry v. Ohio, supra*, 392 US at 27-28, 88 SCt at 1883, this is not such a case. The [officer's] belief . . . was more an "inchoate and unparticularized suspicion or 'hunch,'" 392 US at 27, 88 SCt at 1883,than a fair inference in the light of his experience, [and] is simply too slender a reed to support the seizure in this case.

*Id*. The Supreme Court held that such behavior by traveling members of the public is insufficient to establish reasonable suspicion. *See Reid*, 448 US at 441, 100 SCt at 2754, 65 LEd2d 890.

[¶28.] The same is true here. Even assuming Haar was nervous and considering that an interior luggage cover is designed to hide internal luggage from outside observation, Swets identified nothing suspect about the use of a rooftop cargo box by an out-of-state vehicle traveling on an interstate highway. Moreover, Swets did not demonstrate how two cellular telephones for two passengers, a woman's purse, an energy beverage, food, a ski vest, and a duffel bag demonstrated anything different than that normally found in vehicles involved in travel on

interstate highways. This situation is best described by the Supreme Court's *Mendenhall* language regarding travelers (substituting the parties' names and the location of the encounter): "What [Swets] observed [Haar] do in the [rest area] was not 'unusual conduct' which would lead an experienced officer reasonably to conclude that criminal activity was afoot, . . . but rather the kind of behavior that could reasonably be expected of anyone [traveling on an interstate highway]." 446 US at 572, 100 SCt at 886, 64 LEd2d 497. Consequently, even giving Swets the benefit of his training and experience, and considering all factors together, he had a mere "inchoate and unparticularized suspicion or 'hunch,'" rather than "specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *See Mendenhall,* 446 US at 573, 100 SCt at 1887, 64 LEd2d 497 (citation omitted).

*Conclusion*

[¶29.] Considering the observations of Swets as a whole together with his training and experience, the information available to him at the time of the detention for the canine sniff would not "warrant a man of reasonable caution in the belief that" this vehicle was engaged in drug trafficking. *See Terry*, 392 US at 21-22, 88 SCt at 1880, 20 LEd2d 889 (quotations and internal citations omitted). Because there was no reasonable suspicion for the detention necessary to conduct the canine sniff that justified the search, the officer's actions were not "justified at [their] inception." *See DeLaRosa,* 2003 SD 18, ¶12, 657 NW2d at 688. Therefore, despite the fact that a canine sniff is not a search, the sniff and resulting search

were the product of an unconstitutional seizure or detention requiring suppression. *See Buchanon*, 72 F3d at 1227.

[¶30.] Moreover, what we said in *Ballard* is applicable here:

> This case presents a close question on when . . . detention becomes unreasonable. However, we are concerned with the dubious message we send to law enforcement officers and the public if we validate a procedure allowing officers to falsely tell traffic offenders they are free to go, only for the purpose of eliciting their uncoerced agreement to search their automobiles [or in Haar's case, for the purpose of performing an unconstitutional investigatory detention to conduct a canine sniff].

2000 SD 134, ¶17, 617 NW2d at 842. In *Ballard*, we concluded that a brief detention to conduct a canine sniff "after telling [the suspect] she was free to leave was impermissible under the Fourth Amendment." 2000 SD 134, ¶15, 617 NW2d at 841. We observed that "[a]ll the observations [the officer] made about [the suspect] occurred before he told her she was free to go and no new suspicious information arose before he decided to detain her further." *Id*. Ultimately, we held that a brief detention to conduct a dog sniff was impermissible because "[o]nce officers tell traffic violators they are free to leave with a citation or a warning, the Fourth Amendment intercedes to limit a further detention." *Id*. ¶17, 617 NW2d at 842 (citing United States v. $404,905.00 in US Currency, 182 F3d 643, 648 (8thCir 1999)).

[¶31.] We hold that the circuit court erred in denying Haar's motion to suppress.

[¶32.] GILBERTSON, Chief Justice, and KONENKAMP, ZINTER, MEIERHENRY, and SEVERSON, Justices, participating.