#28041-a-LSW
**2017 S.D. 77**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

vs.

JOHN ERIC HEMMINGER,                      Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
BROWN COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE SCOTT P. MYREN
Judge

* * * *

MARTY J. JACKLEY
Attorney General

PATRICIA ARCHER
Assistant Attorney General
Pierre, South Dakota                      Attorneys for plaintiff and
                                          appellee


WILLIAM D. GERDES
JERALD M. McNEARY JR.
Aberdeen, South Dakota

THOMAS J. COGLEY of
Ronayne and Cogley, PC
Aberdeen, South Dakota                    Attorneys for defendant and
                                          appellant.

* * * *

ARGUED OCTOBER 3, 2017
OPINION FILED **11/21/17**

#28041

WILBUR, Retired Justice

[¶1.] In January 2015, Jessica Goebel died after being stabbed twenty-three times. A jury found her ex-boyfriend John Eric Hemminger guilty of first-degree murder. The court entered a judgment of conviction and sentenced Hemminger to mandatory life in prison. Hemminger appeals. He challenges the circuit court's evidentiary rulings that he consented to the seizure of his property from the hospital and that the revocation of that consent did not require the return of his property. Hemminger also challenges the seizure of his bloody clothing from his friend's house. Additionally, Hemminger claims that the circuit court abused its discretion when it admitted twenty-six autopsy photos during the trial and when it denied his motion for a new trial. Hemminger challenges the sufficiency of the evidence to support the conviction. We affirm.

**Background**

[¶2.] On January 7, 2015, at 2:02 a.m., Hemminger called 911 to report that he had just been stabbed in the hand by Richard Hanley and was on his way to the hospital. He said that he had been at Goebel's home and that someone should go to Goebel's home because Hanley could still be there. Hanley and Goebel were in a relationship. Law enforcement officers went to Goebel's home and found her lying on the kitchen floor in a pool of blood, barely alive. The officers also located two children—Hemminger and Goebel's daughters. The officers searched the home but did not find Hanley. They later learned that Hanley was at a hospital in Fort Yates, North Dakota, being treated for an eye injury. Goebel ultimately died of her injuries.

[¶3.] Sergeant Kory Pickrel met Hemminger at the hospital in response to Hemminger's 911 call claiming that Hanley had stabbed him. Hemminger explained to Sergeant Pickrel that he had gone to Goebel's home around 11:00 p.m. to retrieve his clothes. He and Goebel had recently ended their relationship, but according to Hemminger, were on good terms. Hemminger claimed that while he was at Goebel's home, Hanley attacked him, pulled a knife, and threatened to kill him. Hemminger said that he gouged Hanley's eye during the attack and that Hanley took off running.

[¶4.] Hemminger did not tell Sergeant Pickrel that Goebel had obtained a no-contact order against him or that the two had a rocky, sometimes violent relationship. He claimed that he and Goebel had been communicating all day via text messages and phone calls. Hemminger repeatedly referred the officer to his cell phone. Sergeant Pickrel asked if he could look at Hemminger's phone. Hemminger replied, "Yes, go ahead." Hemminger entered the passcode and handed the phone to the officer. Later, Sergeant Pickrel asked Hemminger if he could seize the phone. Sergeant Pickrel was aware that Goebel had been found brutally stabbed. He, however, told Hemminger he was not being looked into as a suspect. Hemminger replied, "No problem." Hemminger again provided the passcode.

[¶5.] At approximately 4:00 a.m., detectives Chris Gross and Arika Dingman entered Hemminger's hospital room to interview Hemminger. They were both aware that Goebel had been violently assaulted. Detective Gross explained to Hemminger that "before we ever talk to anybody [about] something this serious, we always advise them of their rights. Do you understand that, right?" Hemminger

replied, "Yeah," and Detective Gross read Hemminger his *Miranda* rights. Detective Gross later testified that he read Hemminger his *Miranda* rights as a precaution and because he routinely did so during investigations. Hemminger agreed to speak and explained what had happened that night, which explanation was similar to what he told Sergeant Pickrel.

[¶6.] Detective Gross had concerns about Hemminger's timeline. Prior to questioning Hemminger, Detective Gross had learned that Goebel made a 911 call around 6:00 p.m. reporting that Hemminger and another person were fighting inside her home. Detective Gross continued to question Hemminger about his timeline. Hemminger denied being at Goebel's home at or around 6:00 p.m. and repeatedly referred to his cell phone as support for his version of events. He provided the passcode to his phone again and showed the officers how to determine when calls were made as proof that he was not at Goebel's home around 6:00 p.m.

[¶7.] Hemminger also agreed to let the officers take his clothing. Detective Gross obtained a buccal swab for DNA testing. As Detective Dingman was bagging Hemminger's coat, she saw a knife handle in the pocket. The handle was bloody and had no blade. Later, other officers found a knife blade with no handle in the sink at Goebel's home. Detective Gross arrested Hemminger at the hospital.

[¶8.] During the investigation, Detective Tom Tarnowski obtained a search warrant to examine Hemminger's phone and extract its data. The search uncovered many deleted messages suggesting that Hemminger and Goebel had a contentious relationship. The search also revealed messages indicating that Hemminger was angry about Goebel's relationship with Hanley. The day before the assault,

January 5, Hemminger had sent Goebel a message threatening to come to her house, kick down the door, and kill the "dude with you now."

[¶9.]     The investigation also revealed that around 6:00 p.m. on January 6, the evening of the attack, Goebel made a series of calls to 911 dispatch. She first reported that "John" was fighting. She ended the call before dispatch could gather more information. She called back and claimed that Hemminger was not supposed to be at the address and that he was fighting one of her friends. She again abruptly ended the call. Goebel called again and claimed that she could not identify the individuals fighting and that Hemminger was not involved in the assault.

[¶10.]     Officers later learned from Hanley that Hemminger had come to Goebel's home around 6:00 p.m. while Hanley and Goebel were upstairs in the bedroom. According to Hanley, Hemminger pounded on the home's door, Goebel opened the door, and Hemminger went upstairs looking for Hanley. The two fought, and Hemminger punched Hanley in the eye. Hanley claimed that he ran out of Goebel's home to his mother's house. He also said that his mother took him to the hospital in Fort Yates three hours away. He went to Fort Yates because he received free health services there. According to Hanley, he and his mother stayed at a hotel in Fort Yates until the next day. Officers confirmed that Hanley received care for his eye at the hospital in Fort Yates and stayed the night in a nearby hotel.

[¶11.]     After the fight between Hanley and Hemminger at Goebel's home, Hemminger allegedly went to his friend John Roach's home. Roach lived a short distance from Goebel, and he and Hemminger worked construction together. According to Roach's girlfriend, when Hemminger came to the home on January 6,

he was agitated. He told her about his altercation with Hanley and claimed that Hemminger said that he had "fucked him up and that he was going to fuck them both up."

[¶12.]    When Detective Gross learned that Hemminger went to Roach's home the evening of the attack and that he had spent the previous night there, Detective Gross approached Roach at work and asked for permission to search his home. Roach consented. During the search, the officers opened a black garbage bag located near the entrance. The bag contained a bloody work coat and a dishrag. Roach identified the coat as Hemminger's. The officers seized the bag and took it to the police station for processing. They found multiple bloody items connected to Hemminger: a work coat, dishrag, boots, and clothing. Roach later claimed ownership of the knife that had been found in Hemminger's coat pocket at the hospital.

[¶13.]    Ultimately, Hemminger was indicted for first-degree murder. Prior to trial, Hemminger filed a motion to have the property seized from him at the hospital returned or suppressed. He argued that he never consented to the officers' seizure of his cell phone, clothing, or DNA, and if he had consented, he withdrew that consent three weeks later by written letter. The court denied the motions. Hemminger also moved to suppress the officers' warrantless seizure of the bloody boots, a shirt, and a jacket from Roach's home. According to Hemminger, the clothing belonged to him, and he had a reasonable expectation of privacy in Roach's home. The court denied the motion.

[¶14.]    After a trial, the jury found Hemminger guilty of first-degree murder, which carries a mandatory sentence of life in prison. The circuit court entered a judgment of conviction after denying Hemminger's motion for a new trial.

[¶15.]    Hemminger appeals, raising the following issues:

1. The circuit court erred when it denied Hemminger's motion to suppress evidence seized from Hemminger at the hospital.

2. The circuit court erred when it denied Hemminger's motion to suppress evidence seized from Roach's residence.

3. The circuit court erred when it permitted the State to introduce twenty-six autopsy photographs of the victim over Hemminger's objection.

4. The circuit court erred when it denied Hemminger's motion for a new trial based on the claim that the State improperly shifted the burden to Hemminger during rebuttal closing argument.

5. The evidence was insufficient to support the jury's verdict.

6. The cumulative errors deprived Hemminger of his constitutional right to a fair trial.

## Standard of Review

[¶16.]    "We review the circuit court's grant or denial of a motion to suppress involving an alleged violation of a constitutionally protected right under the de novo standard of review." *State v. Smith*, 2014 S.D. 50, ¶ 14, 851 N.W.2d 719, 723. But "[w]hether a valid consent to search exists is generally a question of fact for the trial court." *State v. Akuba*, 2004 S.D. 94, ¶ 25, 686 N.W.2d 406, 417. On the issue of consent, we review the court's factual findings for clear error. *See State v. Mohr*, 2013 S.D. 94, ¶ 12, 841 N.W.2d 440, 444 (reviewing factual findings for clear error). When there is no dispute of fact, we apply de novo review. *Akuba*, 2004 S.D. 94, ¶ 26, 686 N.W.2d at 418. We, however, "review the circuit court's evidentiary

rulings for an abuse of discretion." *State v. Kiir*, 2017 S.D. 47, ¶ 14, 900 N.W.2d 290, 295. Similarly, the granting of a new trial is within the discretion of the court. *Baddou v. Hall*, 2008 S.D. 90, ¶ 12, 756 N.W.2d 554, 558.

## Analysis

### 1. Motion to Suppress Evidence Seized at the Hospital

*a. Insufficient findings and conclusions*

[¶17.]       Hemminger seeks remand for the circuit court to enter appropriate findings of fact and conclusions of law on the issues of his consent and the State's failure to return his property. He claims this Court cannot conduct a meaningful review because the circuit "court did not enter written *findings of fact and conclusions of law* on Hemminger's motion for reconsideration of the return of his property." While the court did not issue a document titled "findings of fact and conclusions of law" when it conclusively addressed Hemminger's claims, the court issued an incorporated memorandum decision detailing its factual findings and legal reasoning.

[¶18.]       On the issue of Hemminger's consent, the court found "[t]he evidence establishes the following facts":

> Various law enforcement officers made contact with Hemminger at the hospital. Law enforcement was aware that Hemminger had suffered a wound on his hand. Law enforcement was aware that Jessica Goebel had been found in her home and was the victim of multiple stabbings. Hemminger was not in custody or detained. Hemminger was not advised of his Miranda rights. Sergeant Pickrel asked Hemminger if he had spoken to Jessica the day before. Hemminger said that he has spoken to her on the phone and through text messages. The video recording of the interaction between Sergeant Pickrel and Hemminger was admitted into evidence.

> The video recording of the interactions between Hemminger and law enforcement while in the hospital is incredibly valuable in this case. It eliminates any dispute about who said what. It also provides the context and flavor of the continuing interactions. This does not appear in a vanilla transcript of the conversations. **Any person attempting to assess Mr. Hemminger's consent must watch this video.**
>
> It is apparent from the video that John Hemminger was trying to convince the police that he had not been involved in the stabbing of Jessica Goebel. He clearly believed that the information on his phone would help convince law enforcement that he was not responsible. He repeatedly referred law enforcement to the contents of his phone. He provided them ready access to his phone. He provided them with the passcode to his phone. He informed them that he had "no problem" with them taking his phone.
>
> It is also apparent to the [c]ourt, based on evidence it received, that Hemminger had changed his clothing before going to the hospital. Based on his demeanor and conduct during his interactions with law enforcement as shown on the Sergeant Pickrel's video, it is the [c]ourt's finding and conclusion that Hemminger believed that the clothing he was wearing at the hospital would not contain incriminating evidence. Obviously, this belief was incorrect because of the knife handle found in the pocket. Although the belief was erroneous, based on the evidence, [the court is] convinced that was [Hemminger's] belief at the time. He believed the absence of blood and bodily fluids on his clothing would help show that he was not involved in the attack on Jessica Goebel. For this reason, he wanted the State to have the clothes he wore to the hospital. Again he told law enforcement that he had no problem with them taking his clothes. He took the clothes off with the assistance of law enforcement. He did not make any efforts to resist their assistance.

The court also made findings related to Hemminger's previous experience with law enforcement, the nature of the interrogation in this case, and the totality of the circumstances. The court concluded that based on the totality of the circumstances, Hemminger "freely and voluntarily consented" to law enforcement's seizure of his phone and clothing at the hospital.

[¶19.] In regard to Hemminger's motion to reconsider the court's order denying Hemminger's motion for return of property, the court's memorandum decision reiterated its previous finding that "Hemminger voluntarily consented to the State's seizure of his telephone and clothing at the hospital on the night of the incident." It then entered findings related to Hemminger's decision to withdraw his consent. The court found that the items seized via Hemminger's consent became "evidence relevant to the crime alleged in this case." The court recognized that the State did not immediately return the evidence upon Hemminger's request. But the court found that the State "halted all testing on the property." The court also found it appropriate that the State ultimately obtained a warrant to continue to seize Hemminger's property. The court, therefore, held that it would not reconsider its decision to deny Hemminger's motion to return property. On this record, we can meaningfully review Hemminger's issues.

> *b. Whether the circuit court erred when it concluded that Hemminger consented*

[¶20.] Hemminger asserts that the circuit court erred when it concluded that he voluntarily and freely consented to the seizure of his DNA, cell phone, and clothing at the hospital. He claims that he had no other choice but to let the officers take his items because the officers coerced him with a five-hour interrogation and deceived him into believing that the interrogation was merely a friendly encounter. Hemminger directs this Court to Sergeant Pickrel's statements that he wanted to take the phone because the case was "complex" and that it was "just all part of the process." Detective Gross was more commanding, according to Hemminger. He told Hemminger, "We need to take your clothes." Yet at the same time, Detective Gross

assured Hemminger that he would get the items back and that the officers just had to "work the case through."

[¶21.] We note that Hemminger also claims he did not consent to seizure of his DNA. But the circuit court specifically held that Hemminger did not consent. The State claimed during oral argument that the circuit court erred when it concluded that Hemminger did not consent to the seizure of his DNA. But the State did not file a notice of review preserving that issue before this Court. *See Johnson v. Radle*, 2008 S.D. 23, ¶ 19, 747 N.W.2d 644, 652.

[¶22.] Nonetheless, during oral argument, Hemminger alternatively asserted that the circuit court erred when it upheld the seizure of his DNA based on the doctrine of inevitable discovery. "The inevitable discovery doctrine applies where evidence may have been seized illegally, but where an alternative legal means of discovery, such as a routine police inventory search, would inevitably have led to the same result." *State v. Boll*, 2002 S.D. 114, ¶ 21, 651 N.W.2d 710, 716 (quoting *State v. Wagoner*, 24 P.3d 306, 311 (N.M. Ct. App. 2001)). We agree with the circuit court that "[a]ny reasonable officer involved in the investigation would have concluded that a DNA sample from Hemminger was necessary." Indeed, Hemminger was Goebel's recent ex-boyfriend, and the two had a history of violence in the relationship. He was also the subject of Goebel's 911 call the evening before the attack and the reported assailant against Hanley. The court did not err when it applied the doctrine and upheld the seizure of Hemminger's DNA.

[¶23.] In regard to the seizure of his clothing and phone, the circuit court held that Hemminger consented. Consent is an exception to the rule that law

enforcement must obtain a warrant based on probable cause prior to conducting a search or seizure. *State v. Medicine*, 2015 S.D. 45, ¶ 7, 865 N.W.2d 492, 495. For consent to be valid, the State must prove by a preponderance of the evidence that it was voluntarily given. *Id.* The voluntariness of consent is a factual question based on the totality of the circumstances. *Id.* The totality of the circumstances includes the conditions wherein the consent was obtained, the officer's conduct, and the duration, location, and time of the event as well as the accused's age, maturity, education, intelligence, and experience. *Id.* "Whether the accused knew that he possessed a right to refuse consent also is relevant to determining the voluntariness of the consent[.]" *State v. Castleberry*, 2004 S.D. 95, ¶ 9, 686 N.W.2d 384, 387. But "the State need not prove that defendant knew of the right to refuse consent to show that the consent was voluntary[.]" *Id.* The standard for assessing whether consent was coerced or voluntary is one of objective reasonableness. *Akuba*, 2004 S.D. 94, ¶ 31, 686 N.W.2d at 419.

[¶24.] From our review of the record, the totality of the circumstances supports the court's finding of voluntary consent. As we have said, consent need not be explicit—it can be inferred from words, gestures, and other conduct. *Castleberry*, 2004 S.D. 95, ¶ 10, 686 N.W.2d at 387. Here, Hemminger used words indicating voluntariness: "go ahead," "okay," "I've got no problem with that." Also, the conditions wherein the officers obtained Hemminger's consent were nonthreatening. The officers were at the hospital questioning Hemminger because he called 911 requesting that the officers come to him and investigate his claim that Hanley

stabbed his hand. The audio and visual recordings confirm that Hemminger's words, gestures, and conduct indicated willing participation and voluntary consent.

[¶25.] Although the officers had concern about Hemminger's timeline and knew that Goebel had been brutally attacked, Hemminger's status as a possible suspect did not invalidate his consent. He repeatedly referred the officers to his phone, asked the officers to look at the messages on his phone, and gave the officers his passcode to allow them access. We also consider that Hemminger did not object or indicate a desire to refuse consent in response to any of the requests to seize his phone or clothing. The record before the circuit court reveals that Hemminger was 33 years old, had obtained a GED, and had previous experience with law enforcement, including an arrest and incarceration for aggravated assault. Based on the totality of the circumstances, the circuit court did not err when it held that the officers objectively and reasonably believed Hemminger consented to the seizure of his phone and clothing.

### c. Whether consent was validly withdrawn

[¶26.] Hemminger alternatively argues that any right the State had to seize his phone, clothing, and DNA extinguished when he sent a letter to the Brown County State's Attorney's Office on January 26, 2015 (three weeks after seizure), revoking his consent. In that letter, Hemminger demanded the return of his property and the destruction of any biologic evidence. Hemminger contends that the circuit court erred when it did not rule that he had a right to the immediate return of his DNA, the cell phone, and his clothing (namely, his coat and the knife handle in the pocket).

[¶27.]     Hemminger is correct that once consent is given, it may be withdrawn. *State v. Fierro*, 2014 S.D. 62, ¶ 19, 853 N.W.2d 235, 241; 4 Wayne R. LaFave, Search & Seizure § 8.2(f) (5th ed. 2013), Westlaw (database updated October 2017). Thus, when a person revokes his or her prior consent, law enforcement may not rely upon earlier consent to continue the warrantless intrusion. *Fierro*, 2014 S.D. 62, ¶ 19, 583 N.W.2d at 241. However, "revocation of consent does not operate retroactively to render unreasonable that search conducted prior to the time of revocation." *State v. Myer*, 441 N.W.2d 762, 765 (Iowa 1989); *accord Fierro*, 2014 S.D. 62, ¶ 19, 583 N.W.2d at 241 (consent must be withdrawn prior to the completion of the search). Indeed, "[n]o claim can be made that items seized in the course of a consent search, if found, must be returned when consent is revoked. Such a rule would lead to the implausible result that incriminating evidence seized in the course of a consent search could be retrieved by a revocation of consent." *Jones v. Berry*, 722 F.2d 443, 449 n.9 (9th Cir. 1983); LaFave, *supra*, § 8.1(c). More importantly, a "search need not terminate upon revocation of the consent if, on the basis of what has already been discovered, there is now some other legal basis for making the further search." LaFave, *supra*, § 8.1(c) n.174; *Jones*, 722 F.2d at 448-49; *United States v. Perez*, No. CR 10-760 CAS, 2011 WL 223477, * 6 (C.D. Cal. Jan. 20, 2011); *State v. Lane*, 403 S.E.2d 267, 275 (N.C. 1991); *State v. Johns*, 679 S.W.2d 253, 262 (Mo. 1984), *overruled on other grounds by State v. O'Brien*, 857 S.W.2d 212 (Mo. 1993) (en banc).

[¶28.]     Here, Hemminger revoked his consent to the search and seizure of his cell phone and the coat after the officers had another legal basis to continue to

retain the property as evidence. In the process of taking possession of the coat at the hospital based on Hemminger's valid consent, the officers found a bloody knife handle in the coat pocket. Shortly thereafter, the officers discovered the corresponding knife blade at Goebel's home. The officers were not required to return the incriminating evidence seized during Hemminger's valid consent. In regard to the cell phone, Hemminger gave consent on January 7. Relying on that consent, the State obtained a warrant on January 10 to extract data from the phone. On January 11, the State completed its search and data extraction from Hemminger's phone, which data incriminated Hemminger. The court did not err when it denied Hemminger's motion to reconsider the return of property and motion to suppress the same.

**2. Motion to Suppress Evidence Seized at John Roach's Home**

[¶29.]      Hemminger again argues that the circuit court failed to enter sufficient findings of fact and conclusions of law to allow this Court to meaningfully review the issue. The court, however, entered oral findings and conclusions after holding an evidentiary hearing. The court's oral findings and conclusions provide a sufficient basis for this Court to review the circuit court's decision.

[¶30.]      According to Hemminger, the circuit court erred when it held that he did not have standing to challenge the search and seizure of his garbage bag located at Roach's home. Hemminger claims that he had a reasonable expectation of privacy in the bag searched and seized by law enforcement based on his status as an overnight guest. He also argues that the consent given by Roach did not include consent to search the bag in the entryway. The State responds that this Court need

not decide whether Hemminger had a reasonable expectation of privacy in Roach's home. In the State's view, Hemminger failed to demonstrate that Roach lacked authority to consent to the search of the bags in the entryway.

[¶31.] "Consent given to law enforcement to conduct a search satisfies the Fourth Amendment and removes any necessity to obtain a warrant." *State v. Fountain*, 534 N.W.2d 859, 863 (S.D. 1995). Even if we assume Hemminger had a reasonable expectation of privacy in Roach's home, Hemminger is "not automatically entitled to expect that the contents of articles left behind at another premises will remain private and, should he leave such articles behind, he assumes the risk that the other person may consent to a search." *See id.* at 866; *State v. Guthrie*, 2001 S.D. 61, ¶ 59, 627 N.W.2d 401, 424. Hemminger does not dispute that Roach had authority to give and did give law enforcement consent to search Roach's home. While searching the home, the officers observed three garbage bags near the entrance. The garbage bags were in a common area, completely within Roach's control and authority. "In those instances where there exists both shared use and joint access or control of the premises or effects in question, a third party may validly consent to the search of the other's property." *Fountain*, 534 N.W.2d at 863. Because, here, Roach had authority to consent and did consent, and because Roach had shared use, control of, and access to the entrance area and the garbage bags located near the entrance, the circuit court properly denied Hemminger's motion to suppress.

### 3. Introduction of Twenty-Six Autopsy Photographs

[¶32.]    Hemminger argues the circuit court abused its discretion when it admitted the twenty-six autopsy photographs.  In his view, the photographs were not relevant because no one contested that Goebel died or the manner of her death.  He also claims that even if some of the photographs were relevant, "the sheer number of them and the prejudice to Hemminger of such graphic photographs outweighed any relevance that may have existed."  Hemminger argues that the only purpose of introducing such graphic photographs depicting the stab wounds on Goebel's naked body was to inflame the jury.  In response, the State argues that admission of the pictures was necessary to meet its burden of proof and to assist its expert in describing his findings related to the extent, location, and critical nature of Goebel's injuries.

[¶33.]    In regard to the admission of autopsy photographs, we have said:

> It is well settled that photographs are generally admissible where they accurately portray anything that a witness may describe in words.  They are also admissible when they are helpful in clarifying a verbal description of objects and conditions.  They must, however, be relevant to some material issue.  *State v. Holland*, 346 N.W.2d 302, 307 (S.D. 1984).  If relevant, photographs are not rendered inadmissible merely because they incidentally tend to arouse passion or prejudice.  *Id*; *State v. Huth*, 334 N.W.2d 485, 489 (S.D. 1983); *State v. Rash*, 294 N.W.2d 416, 418 (S.D. 1980); *State v. Disbrow*, 266 N.W.2d 246, 254 (S.D. 1978).  Autopsy photographs fall within these rules.  Although disturbing and cumulative, autopsy photographs may be admitted when they are necessary to aid in an expert's presentation of evidence.  *State v. Novaock*, 414 N.W.2d 299, 302 (S.D. 1987).

*State v. Owens*, 2002 S.D. 42, ¶ 89, 643 N.W.2d 735, 756-57; *accord State v. Hart*, 1998 S.D. 93, ¶ 23, 584 N.W.2d 863, 867.

[¶34.]      Here, the circuit court allowed the admission of the photographs during the State's expert's testimony.  It concluded that the photographs were not repetitive (not multiple pictures of the same thing), were presented in a neutral fashion (not the photographs from a crime scene "with blood all over the place"), and that the State was entitled to present evidence related to each of the injuries to Goebel.  We agree.  The photographs were material to assist Dr. Kenneth Snell in his testimony on the cause of death and the manner in which the injuries were inflicted.  *See State v. Herrmann*, 2004 S.D. 53, ¶ 12, 679 N.W.2d 503, 507-08.  The photographs portrayed what Dr. Snell described to the jury and assisted Dr. Snell in his verbal description of his examination and findings.  *See Owens*, 2002 S.D. 42, ¶ 91, 643 N.W.2d at 757 (photographs assisted expert's testimony).

[¶35.]      The photographs were also relevant to the State's burden to prove Hemminger's state of mind and criminal intent.  Hemminger pleaded not guilty, and the State bore the burden of proving every element of the crimes charged.  The fact Hemminger did not dispute the nature of Goebel's death did not relieve the State of its burden.  *Id.* ¶¶ 91-92.  The State had to prove that Hemminger acted with a premeditated design to effect death; or depraved mind or without design to effect death but in a cruel and unusual manner; or with the use of a weapon in a manner likely to inflict death or serious bodily harm.  In doing so, the State had "the right to present its case in any manner it [saw] fit so long as it [stayed] within evidentiary rules[.]" *Herrmann*, 2004 S.D. 53, ¶ 12, 679 N.W.2d at 507.  And the photographs "illustrated the kind and degree of force inflicted to cause" Goebel's injuries and ultimate death.  *See Owens*, 2002 S.D. 42, ¶ 92, 643 N.W.2d at 757.

[¶36.] Even so, Hemminger argues that the twenty-six pictures were needlessly cumulative and had the tendency to cause unfair prejudice that substantially outweighed any probative value. The pictures were not needlessly cumulative. Twenty-three of the twenty-six pictures showed separate stab wounds to Goebel's body. "It is important to remember, however, that because virtually all relevant evidence presented at trial is harmful to the other party, this is not what is meant by unfair prejudice." *Supreme Pork, Inc. v. Master Blaster, Inc.*, 2009 S.D. 20, ¶ 30, 764 N.W.2d 474, 484. So the fact that the photographs could arouse passion or prejudice does not compel the conclusion that the evidence should have been excluded. Unfair prejudice means that the evidence "has the capacity to persuade by illegitimate means." *State v. Knecht*, 1997 S.D. 53, ¶ 12, 563 N.W.2d 413, 419. This the evidence did not do. The circuit court did not abuse its discretion when it admitted the autopsy photographs.

### 4. Denial of a New Trial on Claim of Improper Burden Shifting

[¶37.] Hemminger argues that the State improperly shifted the burden of proof to him during its rebuttal closing argument. During rebuttal, counsel for the State claimed that Hemminger could have entered into evidence any additional text messages beyond the forty-four text messages the State admitted. Hemminger immediately objected and requested a mistrial. The court overruled the objection and denied a mistrial. The State continued its rebuttal closing argument:

> Mr. Gerdes was right when he told you it's not their job to present evidence. He was right. It's not. It's my burden. But I'm going to present to you what is relevant. And like I just said, I didn't present those recordings of Detective Gross saying things that were an exaggeration to his boss. How is that

> relevant? They could have presented those text messages. We talked about that.

Hemminger now argues that he was prejudiced by the State's comments on rebuttal and that the court abused its discretion when it denied his motion for a new trial. He emphasizes that the comments came during the closing argument (a critical stage), that "[n]o curative jury instruction was provided," and that "the jury went into deliberations believing that Hemminger bore a burden of evidence production."

[¶38.]      First, Hemminger presents no evidence that he requested a curative instruction. Second, the State's rebuttal did not shift the burden of proof to Hemminger. The statements were made in response to Hemminger's closing argument faulting the State for not entering into evidence all 449 text messages. The State replied that it presented only the relevant evidence, which to the State included the forty-four messages. The fact the State also said Hemminger could have presented additional text messages pointed out the state of the evidence. The statement did not shift the burden of proof to Hemminger. *State v. Rosales*, 302 N.W.2d 804, 806 (S.D. 1981). The circuit court did not abuse its discretion when it denied Hemminger's motion for a new trial.

### 5. Sufficiency of the Evidence to Support the Jury's Verdict

[¶39.]      Hemminger argues that the evidence does not support a conviction for first-degree murder. He claims that the majority of the State's fifteen witnesses at trial either "had zero relevance" to whether Hemminger murdered Goebel or did not offer substantive testimony about his guilt. Hemminger discredits the other witnesses' testimony as inconclusive. According to Hemminger, holes existed in the State's case, and the jury "clearly overlooked several key pieces of evidence[.]"

[¶40.]    Hemminger's arguments go to the conflict in and weight of the evidence as well as to the credibility of the State's witnesses. But on review, we "will not resolve conflicts in the evidence, pass on the credibility of witnesses, or weigh evidence." *State v. Bucholz*, 1999 S.D. 110, ¶ 33, 598 N.W.2d 899, 905 (quoting *State v. Knecht*, 1997 S.D. 53, ¶ 22, 563 N.W.2d 413, 421). Similarly, when reviewing a challenge to the sufficiency of the evidence, we "accept [the] evidence, and the most favorable inference fairly drawn therefrom, which will support the verdict." *Id.* Hemminger, in contrast, presents the evidence in a light most *unfavorable* to the verdict. Because he has not identified how the evidence in the record—if believed by the jury—fails to sustain the finding of guilt beyond a reasonable doubt, we conclude that the court properly denied Hemminger's motion for a judgment of acquittal.

### 6. Cumulative Effect of the Alleged Errors

[¶41.]    Although "the cumulative effect of errors by the trial court may support a finding by the reviewing court of a denial of the constitutional right to a fair trial," *State v. Davi*, 504 N.W.2d 844, 857 (S.D. 1993), we need not examine this issue based on our rulings on the previous issues.

[¶42.]    Affirmed.

[¶43.]    GILBERTSON, Chief Justice, and ZINTER, SEVERSON, and KERN, Justices, concur.

[¶44.]    JENSEN, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.