#29427-a-SPM
**2021 S.D. 43**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

KEVIN SLEPIKAS,                           Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
BEADLE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE KENT A. SHELTON
Judge

* * * *

JASON R. RAVNSBORG
Attorney General

JONATHAN K. VAN PATTEN
Assistant Attorney General
Pierre, South Dakota                      Attorneys for plaintiff and
                                          appellee.


TUCKER J. VOLESKY of
Volesky Law Office
Huron, South Dakota                       Attorneys for defendant and
                                          appellant.

* * * *

CONSIDERED ON BRIEFS
APRIL 26, 2021
OPINION FILED **07/21/21**

#29427

MYREN, Justice

[¶1.]     During a driving under the influence (DUI) investigation, law enforcement asked Kevin Slepikas (Slepikas) if he would consent to a blood draw. Slepikas twice answered, "okay" in response to the officer's request to draw his blood.  His blood was then drawn without a warrant.  Slepikas moved to suppress the evidence obtained from the blood draw on the basis that it was taken without a warrant or his valid consent.  The magistrate court denied Slepikas's motion to suppress and subsequently found Slepikas guilty of driving a vehicle with alcohol in the blood in violation of SDCL 32-23-1(1).  Slepikas appealed his conviction to the circuit court, and the circuit court affirmed the magistrate court's decision. Slepikas appeals the circuit court's decision, arguing that the circuit court applied an incorrect standard of review and erred in concluding that he provided valid, voluntary consent to the blood draw.  We affirm.

## Facts and Procedural History[1]

[¶2.]     On September 28, 2019, Sergeant Phillip Van Diepen (Sergeant Van Diepen) of the Huron Police Department stopped a vehicle driven by Kevin Slepikas at around 2:05 a.m.  After approaching the vehicle, Sergeant Van Diepen observed an odor of alcohol and several other signs indicating that Slepikas was intoxicated. Sergeant Van Diepen had Slepikas perform field sobriety tests.  During the investigation, several other law enforcement officers arrived at the scene.  Law

---

1.     Our facts involving the traffic stop are derived from the parties' stipulations of facts and the magistrate court's findings of fact.  The record does not contain a transcript from the magistrate court's proceedings nor a video of the arrest.

enforcement administered a preliminary breath test which indicated a .116% breath-alcohol content. They arrested Slepikas around 2:25 a.m. on suspicion of driving under the influence. Officers handcuffed Slepikas and performed a search incident to arrest. During the search, officers offered to retrieve Slepikas's cellphone from his vehicle and to leave in his vehicle any items that would be prohibited in the jail.

[¶3.]		While officers were performing the search, Sergeant Van Diepen said to Slepikas, "Kevin, I have a question for you. You understand that you are under arrest for DUI, correct[?] Do you consent to a blood withdrawal by a medical professional to determine your blood[-]alcohol content?" Slepikas responded, "Okay." Sergeant Van Diepen then asked, "Is that okay? All it is is one sample of blood[.]" He proceeded to explain to Slepikas the booking procedure for a first-offense DUI and then stated, "So you're good to give a sample of blood." Slepikas again responded, "Okay." Law enforcement then transported Slepikas to the jail, where a medical professional drew his blood without a warrant. The blood draw occurred at approximately 2:43 a.m., and subsequent testing indicated a .124 blood-alcohol content.

[¶4.]		The State filed a complaint and an information charging Slepikas with driving a vehicle with alcohol in his blood (SDCL 32-23-1(1)). Slepikas asked the magistrate court to suppress the test results obtained from the blood draw. In support of his motion, Slepikas filed an affidavit relating facts about his personal history. The affidavit states that he is a fifty-eight-year-old high school graduate with no criminal record. It further states that he has a "learning disability" and

receives both social security disability benefits and assistance from the Center for Independence, an organization that provides aid to individuals with "developmental disabilities." Slepikas argued that suppression was warranted because law enforcement performed the blood draw without a warrant or valid, voluntary consent.

[¶5.]    At the suppression hearing, Sergeant Van Diepen testified, and it appears the magistrate court viewed a video of the incident.[2]  In its findings of fact and conclusions of law, the magistrate court noted that Slepikas "has certain intellectual disabilities" but stated that Slepikas presented no evidence showing that his limitations prevented him from understanding law enforcement's request to draw his blood. The court found that law enforcement did not inform Slepikas that he had the right to refuse consent, but they also did not assert that they had authority to take a blood sample without consent or suggest that he had impliedly consented. The magistrate court noted that Slepikas was in custody but found that Slepikas did not give consent under duress. The court denied the motion to

---

2.    The parties stipulated to waiving the transcripts from the magistrate court proceedings. Accordingly, they are not available for our review. However, after the suppression hearing, but before the court trial, the parties filed a stipulation relating the information that had been presented at the suppression hearing. The stipulation states that Sergeant Van Diepen testified at the hearing. It further states that Slepikas did not testify and noted that he submitted facts through his prehearing affidavit. During the proceedings before the circuit court, Slepikas's counsel, in response to a question from the court, indicated that the magistrate viewed a portion of the video of his arrest. The settled record before this Court does not contain any videos. The magistrate court's findings of fact and conclusions of law and order do not reference viewing a video but do state that it reviewed the submitted files and records. Thus, based upon the record available to us, we can only say it appears the magistrate court viewed a video of the incident.

suppress after finding that Slepikas gave his consent knowingly, voluntarily, and intelligently.

[¶6.] Before the court trial, the parties filed two stipulations. One stipulation related the facts surrounding Slepikas's blood draw and the results obtained from the blood draw. The other stipulation related the facts that had been presented at the suppression hearing. In each stipulation, Slepikas reserved the right to object to the admission of the blood-alcohol test results on the basis that law enforcement took his blood without a warrant or his valid, voluntary consent. The magistrate court found Slepikas guilty of driving a vehicle with alcohol in his blood in violation of SDCL 32-23-1(1) and imposed a suspended sentence. Slepikas appealed the conviction to the circuit court. The magistrate court stayed his sentence pending the outcome of the appeal. On appeal, Slepikas argued that the magistrate court erred by denying his motion to suppress the evidence obtained from the blood draw.

[¶7.] During oral arguments to the circuit court, Slepikas argued that the circuit court's standard of review for the issue was de novo. He asserted that, because the parties stipulated to the facts leading up to the blood draw, all that remained was the legal question of whether Slepikas provided voluntary consent. The State responded that clearly erroneous was the standard of review for consent.

[¶8.] Slepikas next argued to the circuit court that he did not provide voluntary consent based on his characteristics, including his lack of experience with law enforcement's procedures and his "intellectual" or "developmental" disability. He further claimed law enforcement created a coercive environment by involving

multiple law enforcement officers, subjecting him to field sobriety tests, asking him to provide consent while searching and handcuffing him, failing to provide him *Miranda* warnings, exerting a show of authority, and using leading questions. He claimed his answers of "okay" were merely passive responses.

[¶9.]     At the hearing, the circuit court noted that the magistrate court had the benefit of listening to the witness's testimony, reviewing a video of the arrest, and determining the credibility of the witness and the truthfulness of his testimony. It noted that Slepikas twice responded, "okay" to the question of whether he would agree to a blood draw, and Slepikas did not present any evidence to the magistrate court showing that his disability affected his ability to understand what law enforcement was asking him at the time of his arrest. It affirmed the magistrate court's decision.

[¶10.]     Slepikas appeals, raising two issues which we restate:

1.     Whether the circuit court applied the correct standard of review to the magistrate court's decision.

2.     Whether the circuit court erred in affirming the magistrate court's decision that Slepikas provided valid, voluntary consent to the blood draw.

## Analysis and Decision

### 1.     *Whether the circuit court applied the correct standard of review to the magistrate court's decision.*

[¶11.]     Slepikas notes that the parties stipulated to the factual record for the court trial and for any subsequent appeal. He claims, due to their stipulations, the sole legal issue before the circuit court and now this Court was whether Slepikas provided valid, voluntary consent. Accordingly, he argues the circuit court erred by

giving deference to the magistrate court's determinations; specifically, it erred by noting that the magistrate court had the benefit of viewing the video of the arrest. He contends that both the circuit court and this Court should apply the de novo standard of review because the facts are undisputed, and he challenged the search under the Fourth Amendment.

[¶12.]     "[W]e review a motion to suppress evidence obtained in the absence of a warrant de novo[.]" *State v. Medicine*, 2015 S.D. 45, ¶ 5, 865 N.W.2d 492, 495. However, we review a lower court's underlying factual findings for clear error. *Id.*; *see also State v. Almond*, 511 N.W.2d 572, 573–74 (S.D. 1994) (citing other jurisdictions also applying the clearly erroneous standard to a determination of voluntariness of consent). "Whether a valid consent to search exists is generally a question of fact for the trial court." *State v. Akuba*, 2004 S.D. 94, ¶ 25, 686 N.W.2d 406, 417 (citation omitted); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S. Ct. 2041, 2047–48, 36 L. Ed. 2d 854 (1973) (stating the issue of whether an individual's consent to a search was voluntary "is a question of fact to be determined from the totality of all the circumstances"). "We will declare a finding of fact clearly erroneous only if we are definitely and firmly convinced that a mistake has been made." *Lien v. Lien*, 2004 S.D. 8, ¶ 14, 674 N.W.2d 816, 822.

[¶13.]     The magistrate court decided the factual issue of whether Slepikas provided valid, voluntary consent after hearing the testimony of a live witness and reviewing a video of the incident. Slepikas relies upon the parties' stipulation to argue that these factual findings can be reviewed de novo. His argument fails because the magistrate court's findings were based, at least in part, on live witness

testimony and a video recording that was not made available for review by either the circuit court or this Court. "When a court 'bases a finding of consent on the oral testimony at a suppression hearing, the clearly erroneous standard is particularly strong since the [court] had the opportunity to observe the demeanor of the witnesses.'" *State v. Castleberry*, 2004 S.D. 95, ¶ 12, 686 N.W.2d 384, 388 (quoting *United States v. Sutton*, 850 F.2d 1083, 1086 (5th Cir. 1988)) (alteration in original). Accordingly, our standard of review remains unaffected by the parties' after-the-fact stipulation regarding the evidence presented at the suppression hearing. *See State v. Fountain*, 534 N.W.2d 859, 862–63 (S.D. 1995) (reviewing consent under clearly erroneous standard, even though parties stipulated to facts for a court trial after a defendant's motion to suppress was denied after an evidentiary hearing involving live witness testimony).

[¶14.]     As to the video recording, it is true that this Court has applied the de novo standard of review to the issue of consent when the trial court made no factual finding on consent, and this Court had access to the same evidence as the trial court. *See Akuba*, 2004 S.D. 94, ¶¶ 25-27, 686 N.W.2d at 417–18. Here, the magistrate court made a finding on consent and neither the circuit court nor this Court had access to the arrest video viewed by the magistrate court. Therefore, we must apply the deferential standard of clearly erroneous to the magistrate court's factual determination on consent.

> **2.     Whether the circuit court erred in affirming the magistrate court's decision that Slepikas provided valid, voluntary consent to the blood draw.**

[¶15.] Slepikas argues that he did not provide valid, voluntary consent to the blood draw. In support of his argument, he notes that he is a fifty-eight-year-old man with no criminal history or familiarity with law enforcement's procedures. He contends that his learning disability impeded his ability to understand what was occurring and made him vulnerable to succumb to law enforcement's tactics. He further claims that his consent was involuntary because it occurred at 2 a.m., the arrest involved multiple law enforcement officers, law enforcement subjected him to field sobriety tests, and he provided consent while law enforcement searched and handcuffed him. He asserts that his responses of "okay" were not affirmative responses but rather passive submissions to law enforcement's show of authority. He claims his first answer of "okay" was in response to Sergeant Van Diepen's statement that he was under arrest. Finally, he argues his consent was invalid because law enforcement did not provide him with *Miranda* warnings or inform him that he could deny consent.

[¶16.] Under both the Fourth Amendment to the United States Constitution and South Dakota article VI, § 11, individuals are protected against "unreasonable searches and seizures[.]" This requires a neutral judicial officer to issue a warrant "based on probable cause prior to the execution of a search or seizure of a person." *State v. Fierro*, 2014 S.D. 62, ¶ 15, 853 N.W.2d 235, 240 (citation omitted). "If the State fails to obtain a warrant prior to conducting a search, it is the State's burden to prove that the search at issue falls within a well-delineated exception to the warrant requirement." *Medicine*, 2015 S.D. 45, ¶ 6, 865 N.W.2d at 495 (citation omitted) (internal quotation marks omitted). "A blood draw constitutes a search of

the person such that the State must obtain a warrant or act under an exception to the warrant requirement." *Id.*

[¶17.] The parties concede that a judicial officer did not issue a warrant prior to Slepikas's blood draw. They dispute whether Slepikas's blood draw meets the consent exception to the warrant requirement. *See Fierro*, 2014 S.D. 62, ¶ 18, 853 N.W.2d at 241 (stating "consent to conduct a search satisfies the Fourth Amendment, thereby removing the need for a warrant or even probable cause" (citation omitted)). "The standard for assessing whether consent was coerced or voluntary is one of objective reasonableness." *State v. Hemminger*, 2017 S.D. 77, ¶ 23, 904 N.W.2d 746, 754. "For consent to a search to be valid, the totality of the circumstances must indicate that it was voluntarily given." *Akuba*, 2004 S.D. 94, ¶ 12, 686 N.W.2d at 412 (citation omitted). To determine whether the defendant provided voluntary consent, "we consider the characteristics of the accused: age, maturity, education, intelligence, and experience. We also consider the conditions wherein the consent was obtained, including the officer's conduct and the duration, location, and time of the event." *Medicine*, 2015 S.D. 45, ¶ 7, 865 N.W.2d at 496 (citation omitted). "A defendant's knowledge of his right to refuse consent is also relevant to, but not necessary for, an ultimate finding of voluntariness." *Id.* (citation omitted).

[¶18.] Due to the parties' waiver of the magistrate court's transcripts and their decision not to place the video of Slepikas's arrest into the record, we are limited in our review of Slepikas's consent. *See Graff v. Child.'s Care Hosp. & Sch.*, 2020 S.D. 26, ¶ 16, 943 N.W.2d 484, 489 (stating, we review a circuit court's record

"insofar as it exists"). We glean the facts surrounding the arrest from the magistrate court's factual findings and the parties' factual stipulations.

> a. *Characteristics of Slepikas: age, maturity, education, intelligence, and experience*

[¶19.] Whether a person is a "'newcomer' to the law" is a factor the Court can consider. *Castleberry*, 2004 S.D. 95, ¶ 13, 686 N.W.2d at 388. Although Slepikas told officers during the incident that he had a previous DUI arrest, his affidavit claimed no criminal history nor history of arrest. As the magistrate court noted, the discrepancies in Slepikas's statements make this factor difficult to weigh.

[¶20.] Slepikas has some type of intellectual disability. But as the magistrate court noted, Slepikas failed to provide evidence establishing that his disability prevented him from understanding what was occurring during the arrest. Nor did he present information that specifically identified the extent and nature of his disability. Instead, the parties and the courts alternated between referring to his disability as an "intellectual" or a "learning" disability. The two referenced designations affect an individual's cognitive functions in different manners, and the interchange of the terms impedes our ability to ascertain the extent of Slepikas's disability. We know from the record that he functioned at a high enough level to receive a high school diploma. But aside from the general statements that Slepikas has a learning disability, neither the magistrate court, the circuit court, nor this Court was presented with evidence establishing that his disability precluded him from understanding and validly consenting to the officer's request to draw his blood.

[¶21.] Finally, regarding whether Slepikas's responses of "okay" constituted affirmative consent to draw his blood, this Court examines "whether his conduct

#29427

would have caused a reasonable person to believe that he consented." *State v.*

*Leigh*, 2008 S.D. 53, ¶ 17, 753 N.W.2d 398, 404 (citation omitted). "[C]onsent need

not be explicit—it can be inferred from words, gestures, and other conduct."

*Hemminger*, 2017 S.D. 77, ¶ 24, 904 N.W.2d at 754 (holding defendant provided

valid consent by using words indicating voluntariness, including, "okay"). "The

wording in a law enforcement officer's question for consent is also relevant."

*Castleberry*, 2004 S.D. 95, ¶ 10, 686 N.W.2d at 387 (stating a defendant's response

of "sure" to law enforcement's questions could have multiple meanings); *see, e.g.*,

*Leigh*, 2008 S.D. 53, ¶¶ 18-19, 753 N.W.2d at 404 (holding defendant's response of

"yeah" did not constitute consent when asked if he would mind if law enforcement

patted him down).

[¶22.]     Here, Slepikas responded, "okay" to the officer's question asking

whether he consented to a blood draw by a medical professional to determine his

blood-alcohol content. Then he again responded, "okay" when asked if he was "good

to give a sample of blood." The record further shows no evidence that Slepikas

objected to the blood draw. While "an absence of protest or objection alone does not

necessitate a conclusion that consent was given[,]" *Leigh*, 2008 S.D. 53, ¶ 19, 753

N.W.2d at 404, this Court has cited a defendant's lack of protest as evidence to

support that a defendant's actions constituted consent. *See Castleberry*, 2004 S.D.

95, ¶ 14, 686 N.W.2d at 389–90. At the suppression hearing, the magistrate court

had the ability to weigh the witness's credibility and view a video of the arrest.

Nothing in the record undermines the magistrate court's determination that

Slepikas's words and actions constituted consent.

>    b.    *Law enforcement officers' conduct and the duration,
>          location, and time of the event*

[¶23.]    The magistrate court determined that Slepikas was in custody. "[T]he condition of being in custody, when combined with other relevant circumstances, can invalidate a consent[,]" but custody alone is not enough to demonstrate coerced consent. *Medicine*, 2015 S.D. 45, ¶ 15, 865 N.W.2d at 499 (citing *United States v. Watson*, 423 U.S. 411, 424, 96 S. Ct. 820, 828, 46 L. Ed. 2d 598 (1976)). According to the magistrate court, while Slepikas was in custody, law enforcement officers were polite and helpful to him. They offered to retrieve his cellphone and to leave in his vehicle any items that would be prohibited in the jail. Slepikas's arrest occurred around 2:05 a.m., and his blood draw occurred around 2:43 a.m. Although the initial investigation occurred in the early morning hours, it was relatively short-lived. It also occurred on a public road where it was not "shielded from public scrutiny[.]" *State v. Kaline*, 2018 S.D. 54, ¶ 14, 915 N.W.2d 854, 858. Based upon the record, it appears law enforcement did not intimidate or coerce Slepikas so as to render his consent "a mere submission to authority." *State v. Morato*, 2000 S.D. 149, ¶ 25, 619 N.W.2d 655, 663.

[¶24.]    Slepikas's additional argument that police officers should have provided him with *Miranda* warnings in light of his custodial status is based upon a faulty reading of our decision in *Medicine*. There, we observed that law enforcement officers are "*not* required to administer a *Miranda* warning to an individual prior to requesting consent for a search, and the failure to give such a warning does not invalidate consent." *Medicine*, 2015 S.D. 45, ¶ 15 n.7, 865 N.W.2d at 499 n.7 (emphasis added). "An officer's request that a suspect consent to a

search, [ ] is not [an] interrogation or its functional equivalent." *Morato*, 2000 S.D. 149, ¶ 23, 619 N.W.2d at 662. In *Medicine*, we responded to the State's factually unfounded argument that the defendant had consented to the seizure of a blood sample by stating that "advising an arrestee that he [or she] has the right to remain silent might, in some cases, serve to mitigate the otherwise coercive nature of custodial questioning." 2015 S.D. 45, ¶ 15 n.7, 865 N.W.2d at 499 n.7. But we have never held that failing to advise a defendant of his or her *Miranda* rights has any significance to determining the voluntariness of his or her consent for a search under the Fourth Amendment.

[¶25.] Here, even though law enforcement had handcuffed Slepikas, the evidence establishes that the environment surrounding his consent was non-coercive. Law enforcement never told Slepikas nor implied that he must consent to the blood draw. On the contrary, Sergeant Van Diepen's colloquy with Slepikas shows a desire on the part of Sergeant Van Diepen to ascertain whether Slepikas was providing consent. Sergeant Van Diepen appears to have started the discussion by stating, "I have a question for you[,]" and then asked if Slepikas would consent to "a blood withdrawal by a medical professional[.]" He continued after Slepikas had already responded, "okay" to ask again, "Is that okay?" He finished the discussion by saying, "so you're good to give a sample of blood." To which Slepikas again responded, "okay." Sergeant Van Diepen's questioning supports the court's finding of voluntary consent.

[¶26.] Based upon the totality of the circumstances, the magistrate court's finding that Slepikas provided valid, voluntary consent to the blood draw was not clearly erroneous. We affirm the circuit court's decision.

[¶27.] JENSEN, Chief Justice, and KERN, SALTER, and DEVANEY, Justices, concur.